AMERICAN HOME ASSURANCE COMPANY, New York Marine & General Insurance Co., Bluewater Insurance ASA, Generali France Assurances, Hamburger Versicherung VVAG VERS A (Converium), Hamburger Versicherung VVAG VERS B(R+V), Gothaer VAG, ING Insurance, and "the Ethniki" Hellenic General Company S.A., Plaintiffs,

v.

MASTERS' SHIPS MANAGEMENT S.A., and Endeavour Navigation S.A. and the Royal Bank of Scotland PLC, Defendants.

No. 03 CIV. 0618(JFK).

United States District Court, S.D. New York.

March 23, 2006.

*FINDINGS OF FACT and CONCLUSIONS OF LAW*

KEENAN, District Judge.

## INTRODUCTION

This is a maritime insurance action arising out of the grounding of the bulk carrier SATURN II off the western coast of India on June 25, 2002. Plaintiffs are a group of insurers that underwrote hull and machinery (H & M) insurance on the SATURN II. Defendants are the owners and managers of the vessel, respectively.[1] Plaintiffs seek a declaratory judgment that the insurance policies are voidable *ab initio* because of defendants' alleged breaches of the duty of utmost good faith, or, alternatively, that they may deny coverage because defendants cannot show a valid claim and because the vessel was unseaworthy.

Defendants have counterclaimed. They allege that the SATURN II was a constructive total loss and that plaintiffs are liable on the policies for $6,000,000. Defendants further allege that plaintiffs failed to satisfy sue and labor and general average obligations under the policies; that plaintiffs themselves breached fiduciary duties during their investigation of the claim; and that plaintiffs' actions with respect to the discharge of cargo and salvage caused additional damage in an undetermined amount. Defendants also contend that plaintiffs should be estopped from denying coverage. Both sides demand attorneys' fees and costs.

This matter was tried to the Bench over seventeen days in February and March 2005. The Court heard oral argument on May 31, 2005. This order constitutes the Court's findings of fact and conclusions of

Waesche, Sheinbaum & O'Regan, P.C., New York, Of Counsel: Francis M. O'Regan, Esq., Richard W. Stone II, Esq., for Plaintiffs.

Freehill, Hogan & Mahar LLP, New York, Of Counsel: Eric E. Lenck, Esq., Michael Fernandez, Esq., John F. Karpousis, Esq., for Defendants Masters' Ships Management S.A. and Endeavour Navigation S.A.

1. The Royal Bank of Scotland PLC is no longer a party to this action. Throughout this order, "defendants" refers solely to Masters' Ships Management S.A. and Endeavour Navigation S.A.

law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### I. BACKGROUND

#### A. *The Parties*

At all relevant times, plaintiffs American Home Assurance Company ("American Home") and New York Marine & General Insurance Co. ("New York Marine") were insurance companies that underwrote H & M insurance on blue water vessels. (S.F. ## 1–2.)[2] American Home's underwriting agent was American International Marine Agency of New York, Inc. ("AIMA"). (S.F. # 1.) New York Marine's underwriting agent was Mutual Marine Office, Inc. ("MMO"), located in New York, New York. (S.F. # 2.) Plaintiffs Bluewater Insurance ASA ("Bluewater") of Oslo, Generali France Assurances ("Generali France") of Paris, and "The Ethniki" Hellenic General Insurance Company S.A. ("Ethniki") of Athens, underwrote H & M insurance on blue water vessels. (S.F. ## 3–4, 6.) Plaintiffs Hamburger Versicherung VVAG VERS A (CONVERIUM) ("Hamburger A"), Hamburger Versicherung VVAG VERS B(R + V) ("Hamburger B"), Gothaer VAG ("Gothaer") and ING Insurance ("ING") underwrote H & M insurance on blue water vessels through their managing general agent Belgian Marine Insurers S.A. ("Belmarine"), located in Liege, Belgium. (S.F. # 5.)

Defendant Endeavour Navigation S.A. ("Endeavour") was a Liberian Corporation and the registered owner of the SATURN II. (S.F. ## 7, 8, 37.) Defendant Masters' Ships Management S.A. ("MSM"), a Liberian corporation with its principal place of business in Athens, managed the SATURN II under a management agreement dated December 22, 1999. (S.F. # 12; Tr. 1242–43; Ex. X–3.)[3] Former Defendant Royal Bank of Scotland PLC, the first mortgagee on the SATURN II, assigned back to defendants its interest in any insurance proceeds paid by the plaintiffs because of the grounding. (S.F. # 52.)

#### B. *The Witnesses*

##### 1. The Crew of the SATURN II

For the present purposes, the two most important crew members of the SATURN II were the master, Captain Manuel Padayhag, and the chief engineer, Rogelio Santos. Both testified by way of deposition.

##### 2. The Plaintiff Insurers

Each underwriter or its authorized agent was represented at trial. The witnesses and their respective affiliations were as follows: Joseph O'Doherty (AIMA), Tim McAndrew (MMO), Erik Lund (Bluewater), François Azou (Generali France), Pierre Cobus (Belmarine) and George Dalianis (Ethniki). All testified during the plaintiffs' case-in-chief.

##### 3. Salvage Operations

Plaintiffs retained the Salvage Association, an H & M surveying firm, to assess the damage to the SATURN II. William Johnstone, a Salvage Association surveyor who visited the vessel, testified for plaintiffs. Defendant Endeavour, with the insurers' approval, retained the British law firm Clyde & Co. to protect its interests on

---

**2.** A blue water vessel is a self-propelled vessel engaged in international trade. "S.F." refers to the stipulated facts in the parties' Joint Pre–Trial Order, dated January 18, 2005.

**3.** Exhibits identified with a letter-number combination (e.g. Ex. X–3) are defendants' trial exhibits. Exhibits identified solely by number (e.g. Ex. 25) are plaintiffs' trial exhibits.

"Tr." refers to the trial transcript.

issues of salvage. Martin C. Hall from Clyde & Co. testified during plaintiffs' direct case.

### 4. The Post–Grounding Investigation

Plaintiffs retained Evdemon & Partners ("Evdemon") to inspect the SATURN II after the grounding. Stavros Trimis, a senior surveyor at Evdemon, testified for plaintiffs. AI Marine Adjusters ("AI Marine") handled the investigation of the SATURN II insurance claim on behalf of the underwriters. Vincent Corteselli, the manager of H & M liabilities at AI Marine, testified during the plaintiffs' direct case. Mr. Corteselli contacted Aquila Maritime Business, Inc. ("Aquila") in Manila for assistance in setting up interviews with former crew members of the SATURN II. Andrew J. Malpass, the executive vice president of Aquila at the time, testified for plaintiffs.

### 5. Plaintiffs' Expert Witness

Harry S. Keefe, who retired in 1998 after a 40–year career in the marine insurance business, offered expert testimony on H & M insurance for plaintiffs. In his last position, Mr. Keefe was vice president and manager of the blue water hull underwriting department at GRE Insurance Group. (Tr. 21; Ex. 141.)

### 6. Defendants Endeavour and MSM

Nikos Christodoulatos testified at trial on behalf of MSM. Nikos was the managing director at MSM—in his words "the top man in the company"—in 2002. (Tr. 1241.) Nikos's father, Gerassimos Christodoulatos, testified by deposition. Gerassimos was a member of the board of administration at Endeavour during the relevant time period. Nikos testified that Gerassimos was not employed by MSM in 2002 and had no involvement with the SATURN II. (Tr. 1244.) This was one of

many lies from that witness. As will be discussed in greater detail below, there is ample evidence that Gerassimos was actively involved with MSM, the SATURN II account and the aftermath of the grounding.

MSM's crew manager, Georgios Petsinis, and superintendent engineer, Petros Moundreas, also testified for defendants—with much the same lack of forthrightness as Nikos Christodoulatos.

### 7. Defendants' Insurance Broker

The insurance broker for Endeavour and MSM with respect to the placement of the H & M insurance was HBI International Ltd. ("HBI"). HBI had an office in New York. Both sides designated Anthony Piazza, the president of HBI during the relevant time period, as an intended witness. He testified during plaintiffs' case-in-chief. There was no need to call him back to testify during defendants' case.

### 8. Defendants' Expert Witness

Captain John Bergin offered expert testimony for defendants on navigation. Captain Bergin retired in 2001 after over 30 years as a seagoing master. He now teaches advanced ship handling courses at the Maritime Institute of Technology. (Tr.1952, 1957.)

## C. *The Vessels on Defendants' Account*

The SATURN II was a 64,535 metric-ton deadweight bulk carrier built in 1981. It was 224.50 meters (736.55 feet) in length, 32.20 meters (105.64 feet) in breadth and 17.70 meters (58.07 feet) in depth. A Sulzer 6 RND 76M type main engine powered the vessel. (S.F.# 9.) The agreed value of the vessel for the purposes of H & M insurance was $7,500,000. (S.F.# 27.) The vessel's sound market value at the time of the June 25, 2002

grounding was between $4,000,000 and $4,500,000. (Tr. 455–56, 465, 493–94.)

The size of the MSM fleet fluctuated prior to 2002. On June 22, 2000, there were four ships on the account: the SATURN II, MADONA, AFRICANA and SILVER TOY. (Tr. 187–88, 401–02.) Nikos Christodoulatos testified that in 2000, when American Home wrote H & M insurance as the lead underwriter on the MSM account, the SILVER TOY was insured as a single vessel. He said that the MADONA, AFRICANA and SATURN II were added later. (Tr. 1255–56.) The Court discounts this testimony and just about everything else Mr. Christodoulatos said on the stand. He was one of the least credible witnesses the Court has seen in over 22 years. Both Mr. O'Doherty and Mr. Piazza testified credibly that there were four ships on the account in 2000, one of which was the SILVER TOY. (Tr. 232, 401.) The MADONA was lost at sea, bringing the fleet size down to three. (Tr. 232.)[4] The AFRICANA was sold sometime prior to May 22, 2002. (Tr. 402–03.) MSM made attempts to purchase other vessels, but the fleet size remained at two (SILVER TOY and SATURN II) as of early May 2002. (Tr. 396–97, 403.)

The SILVER TOY was sold for scrap pursuant to a contract dated May 24, 2002 and delivered to a scrap yard in China on or about June 6, 2002. (S.F. ## 13, 25–26.) Nikos Christodoulatos testified that he did not become aware of the sale until June 2002. (Tr. 1269.) This testimony was incredible, coming as it did from the self-proclaimed "top man" at MSM. Mr. Christodoulatos in so testifying wants the Court to believe that during the early stages of the H & M renewal process, which began in May 2002, he knew nothing

about the sale of the SILVER TOY. Thus he would not have known that the SATURN II was the only vessel on the account. The Court rejects this testimony.

There was one additional vessel: the DOO YANG HOPE. This vessel was listed as part of MSM's fleet on documents sent to the underwriters during negotiations in 2002. On some of the documents, the abbreviation "TBR," ("to be renamed") or some equivalent description appeared. Plaintiffs assumed that defendants had acquired the DOO YANG HOPE and would add it to the fleet. (Tr. 191.) Defendants deny making any such guarantee. (Tr. 387.) The DOO YANG HOPE was never purchased and never became part of the MSM fleet. (S.F. # 24.)

## II. THE INSURANCE POLICIES

### A. *Overview*

MSM was responsible for arranging H & M insurance for the SATURN II. (S.F. # 14.) Endeavour relied on MSM to obtain this insurance. (S.F. # 15.) HBI was the U.S. based broker for MSM and Endeavour and coordinated all placement negotiations on their behalf. (S.F. ## 16–17; Tr. 348–49.) Inship Ltd. was MSM's local insurance broker in Greece and acted as the liaison between HBI and MSM. (S.F. # 18.) As plaintiffs proved repeatedly at trial, the brokers acted on behalf of the owners, not the insurers. (Tr. 50, 83, 187–88, 258, 301, 348–49.)

The SATURN II was insured for a 12–month period commencing June 22, 2002. Eighty percent of the SATURN II'S $7,500,000 agreed value was insured with plaintiffs. Each underwriter agreed to insure its respective share as follows:

---

**4.** The date of the MADONA's loss is not clear. Some documents in evidence suggest September 18, 2000. (Ex. 25, 31.) Defendants say it was in 2001. (Def. Prop. Findings of Fact at 8.) In any event, the loss surely was before June 2002.

| American Home | 15.0% | $1,125,000 |
| New York Marine | 12.5% | $ 937,500 |
| Bluewater | 20.0% | $1,500,000 |
| Generali France | 10.0% | $ 750,000 |
| Hamburger A | 4.5% | $ 337,500 |
| Hamburger B | 4.5% | $ 337,500 |
| Gothaer | 1.5% | $ 112,500 |
| ING | 4.5% | $ 337,500 |
| Ethniki | 7.5% | $ 562,500 |
| | 80.0% | $6,000,000 |

(S.F. ## 20–23, 28.) Each of the plaintiffs, as discussed more fully below, entered into a separate insurance contract evidenced by a binder, bordereau, cover note or slip. (Ex. 4, 22, 28, 34, 38.)[5] The policy for the SATURN II was based on the American Institute Hull Clauses Form 1–16.2 (June 2, 1977). (Ex. 5.) The policy provided coverage for a constructive total loss if the expense of recovering and repairing the vessel exceeded the $7,500,000 agreed value. (Ex. 5 at 1–229.) The policy also contained American Institute Form 1.16–7 (June 2, 1977). This provision was a liner negligence clause which covered:

> Loss of or damage to the subject matter insured directly caused by:
>
> 1. Accidents on shipboard or elsewhere . . .;
>
> 2. Negligence, error of judgment or incompetence of any person;
>
> . . . .
>
> provided such loss or damage . . . has not resulted from want of due diligence by the Assured(s), the Owner(s) or Managers(s) of the Vessel, or any of them.

**5.** No policy or policies, per se, were issued. Throughout this opinion, the Court refers to all of the insurance contracts collectively as "the policy."

**6.** A general average clause typically provides that the insurer will share the loss that results from the intentional sacrifice of part of a venture (e.g. the cargo) in order to avoid a

(Ex. 6.) The policy additionally covered general average and sue and labor expenses. (Ex. 5; Tr. 194–96, 1184–88.)[6]

### B. The Placement of the H & M Insurance

The terms of the insurance policy are not at issue. What the parties dispute, *inter alia*, is whether the defendants made material misrepresentations during placement of the insurance. The evidence at trial on this issue was as follows:

### 1. American Home/AIMA

On May 20, 2002, Anthony Piazza, the president of HBI, acting on behalf of MSM, sent a provisional binder via facsimile to Joseph O'Doherty, the vice president and hull manager for bluewater business at AIMA. (Ex. 1; Tr. 184, 348.) Mr. O'Doherty testified that the MSM account was a renewal account. (Tr. 185.) American Home, through AIMA, had written H & M insurance for MSM in June 2000. (Ex. 142.) For the 2002 policy, American Home would act as lead underwriter. According to the second page of the binder, the proposed coverage would be "HULL AND MACHINERY, ETC." The names of the vessels were " 'SILVER TOY' PLUS 2 AS PER ATTACHED SCHEDULE." (Ex. 1.) The schedule listed three vessels: "SILVER TOY," "SATURN II" and "DOO YANG HOPE TBR." (*Id.*) The abbreviation "TBR" meant "to be renamed." (Tr. 187, 258.) The facsimile cover sheet accompanying the binder stated: "PLEASE NOTE THE 'DOO YANG HOPE' WILL IN ALL LIKELY HOOD [sic] ATTACH

total loss (e.g. the sinking of the ship). *See Black's Law Dictionary* 964 (8th ed.2004).

A sue and labor clause usually binds the insurer to cover some or all of the costs arising out of the insured's obligation to protect the covered property and minimize loss or damage to that property. *See id.* at 1473.

PRIOR TO THE RENEWAL DATE SO WE WILL ALSO NEED A RATE TO ATTACH HER TO THE CURRENT FLEET." (Ex. 1.) The binder also contained the proposed rates and deductibles. On May 23, 2002, Mr. Piazza faxed Mr. O'Doherty a further written proposal modifying the proposed rates and deductibles for the SILVER TOY, SATURN II and DOO YANG HOPE. (Ex. 2.)

On May 30, 2002, one of Mr. O'Doherty's colleagues at AIMA sent a fax to Mr. Piazza confirming AIMA's "binding of a 15% line of the [MSM] account, as per the rates, terms and conditions outlined in [HBI's] faxes of May 20 and May 23, 2002." (Ex. 3.) HBI provided AIMA with a final binder dated June 28, 2002, which AIMA signed and stamped on behalf of American Home. (Ex. 4.) The vessels again were listed as the SILVER TOY, SATURN II and DOO YANG HOPE TBR. (*Id.*) The inception date of the policy was June 22, 2002 at 0900 hours Greek time "EXCEPT VESSEL 3 [DOO YANG HOPE] WHICH FROM TIME AND DATE OF ATTACHMENT TO BE ADVISED TO COMMON EXPIRY." (*Id.*)[7]

Sometime after the inception date, Mr. Piazza learned that the SILVER TOY had been sold. He telephoned Mr. O'Doherty with this information. This was the first time that AIMA had heard of the SILVER TOY'S sale. (Tr. 197–98.) Mr. O'Doherty could not recall the exact date of the telephone conversation, but in a handwritten memorandum dated June 27, 2002, two days after the grounding, he wrote "June 3—Sold->SILVER TOY." (Tr. 198; Ex. F–17.) The credible testimony of Messrs. O'Doherty and Piazza establishes that AIMA was not aware that the SILVER TOY had been sold on June 6, 2002. (Tr. 213.) There is evidence that MSM sent a fax to HBI on June 13, 2002 advising HBI that the SILVER TOY had been sold and that this information should be conveyed to the underwriters. (Ex. K–4; Tr. 1270, 1371–74.) This evidence conflicts with Mr. Piazza's testimony. (Tr. 358.) Regardless, AIMA was not notified of the sale. AIMA therefore was not aware that it would be insuring only a single vessel, the SATURN II.

Mr. O'Doherty further testified as to his assumption that the DOO YANG HOPE would attach to the policy. (Tr. 191, 236.) In his words, he believed that the brokers had approached him for a quote on the DOO YANG HOPE "in the anticipation that it would be bought." He testified that "basically it's supposition; that the vessel was shown on the schedule to be attaching during that policy period when we underwrote the risk." He conceded, however, that there was no document in his files showing affirmatively that the vessel had been bought. (Tr. 236.) Nikos Christodoulatos testified that he never represented to his brokers or to the underwriters that the DOO YANG HOPE had in fact been purchased. (Tr. 1267.) The Court is inclined to believe this statement because Mr. Piazza testified that he also did not make such a representation to the underwriters. (Tr. 387.)

The sale of the SILVER TOY and failure to acquire the DOO YANG HOPE meant that the SATURN II was the only vessel on MSM's account during placement negotiations in late May and June 2002. In maritime parlance, the MSM account was a "singleton"—a fleet consisting of one vessel. Mr. O'Doherty testified that had he known that the account was a singleton, he would not have agreed to accept the risk and renew the insurance. (Tr. 213.) In 2002, AIMA's policy was not to consider single-vessel risks as new or renewal busi-

7. The inception date was the same for all of the insurance contracts.

ness. (Tr. 199.) The Court accepts Mr. O'Doherty's testimony as credible.

### 2. New York Marine/MMO

On May 20, 2002, Mr. Piazza sent a provisional binder to Tim McAndrew, a marine underwriter at MMO, the managing general agent of New York Marine. (Ex. 14; Tr. 298.) The MSM account was renewal business for New York Marine, as it was for American Home. The binder schedule listed three vessels: "SILVER TOY," "SATURN II" and "DOO YANG HOPE TBR." The binder also contained expected rates and premiums for the three vessels, which were to be deemed separately insured. (Ex. 14.) In other words, the insurance would be treated as though three separate contracts of insurance had been issued, one for each vessel in the fleet. (Tr. 243.) On May 29, 2002, Mr. Piazza advised Mr. McAndrew by fax that HBI had concluded negotiations with the lead underwriter, American Home. On June 19, 2002, MMO, on behalf of New York Marine, confirmed acceptance of a 12.5% share of the proposed risk. (Ex. 18; Tr. 317–18.) HBI provided MMO with a final binder dated June 28, 2002, which MMO signed and stamped on behalf of New York Marine. (Ex. 4.)

Mr. McAndrew testified that prior to June 22, 2002, MMO was not aware that the SILVER TOY was no longer part of the MSM fleet, or that the SILVER TOY had been scrapped. Mr. McAndrew also testified that MMO had no knowledge prior to June 22, 2002 that the DOO YANG HOPE did not become part of the MSM fleet. In 2002, MMO was willing to underwrite single-vessel risks only when able to transfer its exposure to a "total loss only" ("TLO") reinsurer. MMO even went to the TLO market when MMO was under the impression that the MSM fleet consisted of three vessels. (Tr. 325.) The cost of

TLO coverage was prohibitive, so MMO did not buy it. (Tr. 326.) Mr. McAndrew noted that the TLO reinsurance rate for SATURN II alone probably would have been even higher (25 to 30 percent) than the rate for the SATURN II as part of a fleet. (Tr. 328.) He testified that MMO ultimately would have declined the 12.5% share of the risk on the MSM account had MMO known that the account was a singleton. (Tr. 326.) The Court finds Mr. McAndrew's testimony credible.

### 3. Bluewater

On June 7, 2002, Kjell Einarsveen of the Norwegian broker Anglo–Nordic Insurance Brokers A/S ("Anglo–Nordic"), with whom HBI was working, sent an email to Erik Lund, an underwriter at Bluewater. (Ex. 19; Tr. 124.) Attached to the email was a three-page proposal requesting that Bluewater underwrite a portion of H & M insurance for the vessels in MSM's fleet. (Ex. 19; Tr. 125–26.) This proposal to Mr. Lund represented new business for Bluewater. (Tr. 126.) Mr. Einarsveen described the risk as follows: "The fleet currently comprises two bulk carriers but we understand that a new acquisition— 'DOO YANG HOPE'—will be added to the slip shortly." (Ex. 19.) Mr. Lund testified that he understood the proposal as representing that three vessels were in the MSM fleet. (Tr. 126.)

After receiving the proposal, Bluewater undertook an evaluation of the risk that included an analysis of the number of vessels on the account, the class of the vessels, the size of the vessels and the terms and conditions. (Tr. 127.) On June 10, 2002, Mr. Lund e-mailed Mr. Einarsveen that Bluewater was "interested in subscribing for a share of 20% of this [MSM] fleet." (Ex. 20.) On June 21, 2002, Mr. Einarsveen informed Mr. Lund by email that Anglo–Nordic had received instruc-

tions to tie up a 20% share with Bluewater. (Ex. 21.) On June 24, 2002, Mr. Lund e-mailed Mr. Einarsveen and confirmed Bluewater's 20% share. (*Id.*)

Anglo–Nordic provided Bluewater with a provisional insurance bordereau and addendum, which Bluewater stamped. (Ex. 22.)[8] Mr. Lund credibly testified that after the June 22, 2002 inception date, Bluewater learned for the first time that the SILVER TOY had been scrapped. (Tr. 133.) He also testified as to Bluewater's understanding that the DOO YANG HOPE had been purchased and was awaiting only a formal takeover. (Tr. 133–34.) Bluewater was not advised prior to the inception date of the policy that the DOO YANG HOPE was not part of the MSM account, nor was Bluewater advised that the account was a singleton. (Tr. 133, 138.) Mr. Lund testified that this information would have controlled Bluewater's decision to insure the risk because Bluewater's general underwriting policy in 2002 was not to underwrite single-vessel risks except "in a few occasions if it made commercial sense." (Tr. 134.) Mr. Lund testified that had Bluewater known that the MSM account was a singleton, Bluewater would not have underwritten a 20% share on the terms presented in Anglo–Nordic's proposal. (Tr. 138.) If Bluewater had underwritten such a risk, it would have charged a higher premium, required higher deductibles or agreed only to limited terms. (Tr. 135.) The Court accepts this testimony as credible.

### 4. Generali France

On June 11, 2002, Steven Watson of the French broker La Sécurité Nouvelle ("LSN"), with whom HBI was working, faxed a proposal to Stephane de Rooy of Generali France. Mr. de Rooy was the assistant to François Azou, the head of Generali France's H & M department at the time. (Ex. 25; Tr. 81, 87.) Mr. Watson requested that Generali France underwrite a portion of the H & M insurance for the vessels in MSM's fleet. (Ex. 25.) The name of the three ships (SATURN II, SILVER TOY, DOO YANG HOPE) appeared in the proposal. (Ex. 25.)[9] In a facsimile dated June 14, 2002, Mr. Watson represented to Mr. de Rooy that MSM had "recently purchased" the DOO YANG HOPE. (Ex. 26.) The same day, after Generali France completed its evaluation of the risk, Mr. de Rooy informed Mr. Watson that Generali France would be prepared to take a 10% share. (Ex. 25; 83–84, 87, 93–94.) Mr. Watson confirmed Generali France's 10% share in an email to Mr. de Rooy dated June 21, 2002. (Ex. 27.)

Mr. Azou testified that Generali France did not learn until October 2002 that the SILVER TOY had been sold prior to the June 22, 2002 inception date. (Tr. 94, 122.) Mr. Azou was aware that the DOO YANG HOPE was to be renamed, but he believed that the vessel would attach to the policies during the policy year. (Tr. 93.) Mr. Azou explained that Generali France had written guidelines that generally prohibited single-vessel risks. (Ex. 29; Tr. 97.) There were exceptions to the rule: (1) if the vessel was recently built and high-valued, or (2) if the vessel had the "probability" of being part of a larger fleet. (Tr.

---

**8.** Mr. Lund explained that the "bordereau" set forth the terms and conditions under which Bluewater agreed to underwrite the 20% share. (Tr. 130.) Those interested in late nineteenth-century European history might recall that the discovery of a bordereau

containing a list of secret French documents triggered the tragic chain of events known as the "Dreyfus Affair."

**9.** The DOO YANG HOPE appears on this document *sans* the "TBR" designation.

97.) Mr. Azou testified that "recently built" to Generali France meant a vessel less than five years old. (Tr. 96.) "High value" meant $100 million at a minimum. (Tr. 97.) The SATURN II was 21 years old with an insured value of $7,500,000. It did not fit into the first exception. Mr. Azou testified that since 1998, Generali France had never written a single-vessel risk under the second exception. (Tr. 98.) Mr. Azou noted that Generali France was free to decline a single-vessel risk even if it met one of the two exceptions. (*Id.*)

Mr. Azou testified that Generali France would not have agreed to underwrite the 10% share of H & M insurance for the MSM account had Generali France known that the SATURN II was the only vessel on the account. (Tr. 122.) The Court finds Mr. Azou's testimony credible.

### 5. The Hamburger Insurers, Gothaer and ING

On May 31, 2002, Mr. Watson of LSN sent a fax to Belmarine requesting it, on behalf of its principals, to underwrite a portion of the H & M insurance for the vessels in MSM's fleet. (Ex. 31; Tr. 46–47.) Listed in the proposal are the vessels SATURN II, SILVER TOY and DOO YANG HOPE. (Ex. 31; Tr. 49.) On the same day, Belmarine informed LSN by fax that Belmarine could accept a 20% share of the proposed risk on either of two specified conditions having to do with premiums and deductibles. (Ex. 32; Tr. 51–52.) On June 24, 2002, Mr. Watson offered Belmarine a 15% share of the risk and requested a modification of one of the two specified conditions. (Ex. 33; Tr. 54.) Belmarine agreed to the modification and accepted the 15% share. (Ex. 33; Tr. 54–55.)

LSN provided Belmarine with a Cover Note dated June 25, 2002, which Belmarine stamped. (Ex. 34.) Three vessels are listed on the Cover Note: the SAT-URN II, SILVER TOY and DOO YANG HOPE. (Ex. 34.) Next to "DOO YANG HOPE" is an asterisk referencing the notation " vessel n° 3 wef dtba" ("with effect from date to be advised"). (Ex. 34; Tr. 56.) The vessel is listed as "TBR" elsewhere in the cover note. (Ex. 34.) Pierre Cobus, an assistant marine underwriter at Belmarine, testified that this expression indicated that the DOO YANG HOPE was not to be insured immediately, but at some later date during the policy period. (Tr. 56–57.) Mr. Cobus testified on cross-examination, however, that "TBR" also could mean that the vessel was going to be purchased and then renamed. (Tr. 65–67.)

The 15% share of H & M insurance was underwritten as follows among Belmarine's principals: Hamburger A—4.5%, Hamburger B—4.5%, Gothaer—1.5% and ING—4.5%. (Ex. 43.) According to Mr. Cobus, it was not until October 15, 2002 that Belmarine learned of the sale of the SILVER TOY. (Tr. 58.) He further testified that Belmarine never received documentation from LSN explaining that the DOO YANG HOPE would not become part of MSM's fleet. (*Id.*) Belmarine only became aware of this fact in late October 2002 upon receiving a fax from LSN stating that the lead underwriter had ceased to insure the ship. (*Id.*)

Mr. Cobus testified that Belmarine did not necessarily refuse to underwrite single vessel risks. (Tr. 59.) He made clear, however, that Belmarine treated singletons differently from multiple-vessel fleets. (*Id.*) Belmarine would charge different premiums and deductibles, require different conditions or underwrite a smaller share of the risk. (*Id.*) He testified that if Belmarine had known that the MSM account was a singleton, such knowledge would have controlled Belmarine's decision to underwrite the risk. (Tr. 60.) At the very least, Belmarine would have charged

a higher premium or accepted a smaller share of the risk. (*Id.*) The Court accepts this testimony as credible.

### 6. Ethniki

On June 19, 2002, the English broker Forbes sent a fax to Ethniki requesting that it underwrite a portion of H & M insurance for the vessels in MSM's fleet. (Ex. 35; Tr. 256–57.) The vessels in MSM's fleet were represented as the SILVER TOY, SATURN II and DOO YANG HOPE TBR. (Ex. 35.) George Dalianis, the director of the marine casualty and credit division at Ethniki in 2002, testified that the letters "TBR" in no way meant that the DOO YANG HOPE would not attach to the insurance. (Tr. 255, 258.) On June 20, 2002, after evaluating the risk, Ethniki notified Forbes by facsimile that Ethniki was ready to underwrite a 7.5% share of the proposed risk on a "cancelling returns only" ("CRO") basis. (Ex. 36; Tr. 259–60.) [10] On June 22, 2002, Forbes confirmed back to Ethniki that it had obtained a firm order for a 7.5% share of the risk on the terms and conditions in Ethniki's June 20 facsimile. (Ex. 37; Tr. 260.)

On June 24, 2002, Forbes sent an insurance slip to Ethniki. (Ex. 38; Tr. 260–61.) The slip, as defined by Mr. Dalianis, was the "official document" to bind the insurance. (Tr. 261.) The slip lists three vessels: the SILVER TOY, SATURN II and DOO YANG HOPE "[i]ncluding, if required, New and/or Acquired and/or Managed and/or Chartered vessels on values, terms, conditions and rates to be agreed." (Ex. 38.) The inception date of the policy, as in all cases, was June 22, 2002.

Mr. Dalianis testified that Ethniki was never advised prior to the inception date that the SILVER TOY had been sold or scrapped. (Tr. 263.) He testified that Forbes never advised Ethniki that the DOO YANG HOPE did not become part of the MSM fleet. (*Id.*) He testified that at no time during the placement of the H & M insurance was Ethniki informed that there was only one vessel on the MSM account. According to Mr. Dalianis, this knowledge would have controlled Ethniki's decision to underwrite the risk. (Tr. 268.) In 2002, Ethniki's underwriting practice was not to insure singletons without serious consideration of the risk. (*Id.*) Mr. Dalianis insisted that at no time would Ethniki agree to a risk as high as 7.5% for a singleton. If Ethniki were to insure a single vessel, it would charge a higher premium than for a vessel that was part of a fleet. (Tr. 268–69.) Moreover, in the underwriting year 2002, Ethniki rejected 137 proposals, twenty-one of which were because the risk involved a singleton. (Ex. 40; Tr. 266–67.)

Mr. Dalianis testified that if Ethniki had known that the SATURN II was the only vessel in the MSM account, Ethniki may not have underwritten the risk at all or, at the very least, it would have demanded a higher premium and a lesser share of the risk. (Tr. 268–69.) The Court finds this testimony credible.

### C. *Marine Insurance and Recuperative Power*

There was much attention paid at trial to the distinction between a singleton and a multiple-vessel fleet in the insurance context. The insurers' representatives all testified credibly that insurance companies are far less likely to insure a vessel if it stands alone rather than as part of a fleet.

---

10. "CRO" means that the policy does not allow for any return of premium to the assured for periods that the vessel is not in operation (i.e. "laid up"). The assured receives a return of premium only if there is a cancellation of the policy, for example if the vessel is sold. (Tr. 321–23.)

The reason is that insurers prefer to spread their risk whenever possible. Harry S. Keefe, plaintiffs' expert witness on H & M insurance, stated that the focus of the business is "recuperative power." (Tr. 25.) If the insurer insures a single ship, and that ship is lost, the insurer pays the claim, the risk ends and there is no chance for the insurer to recoup his loss. If the insurer insures the same ship as part of a fleet and the ship is lost, the insurer recoups the loss from increased premiums on the other ships in the fleet. (Tr. 24–26.) Messrs. Cobus, Lund and O'Doherty were in agreement with Mr. Keefe on this point. (Tr. 59, 135–36, 199.) Mr. Keefe also noted that in the event of a loss of a single vessel, the owner may form a new company, buy another ship and come out as a new assured with a clean record. (Tr. 26.) Such action also would deprive the insurer the opportunity to recoup his loss.

Mr. Keefe conceded on cross-examination that there is no industry-wide prohibition among bluewater H & M underwriters against insuring singletons. (Tr. 36.) Defendants also brought out at trial that some underwriters or their agents did not have written guidelines prohibiting the underwriting of singletons. (Tr. 62, 106, 134, 142.) American Home had a four-vessel minimum fleet size guideline that applied to new accounts, but not to renewal accounts such as MSM's. (Tr. 224; Ex. 7.) Moreover, Mr. O'Doherty testified that he had the discretion to deviate from American Home guidelines on insuring singletons. (Tr. 225.) This evidence does not contradict the credible testimony of Messrs. Keefe, O'Doherty, McAndrew, Lund, Azou, Cobus and Dalianis that the underwriters would have been loath to underwrite the MSM account if they had known it was a singleton. Even Mr. Piazza, the owners' broker, testified that fleet size was a material fact that should have been disclosed to the insurers. (Tr. 359.)

Nikos Christodoulatos agreed that it was important for the insurers to be informed about the sale of the SILVER TOY "for pricing reasons." (Tr. 1377.)

## III. THE GROUNDING OF THE SATURN II

### A. *The SATURN II's Overloaded Departure*

On May 27 and 28, 2002, the SATURN II was at port in Xingang, China. (S.F. # 31.) According to a draft survey measurement, approximately 63,897 metric tons of coal were loaded onto the vessel at this time. (*Id.*) On the morning of May 28, 2002, local time, the SATURN II departed Xingang. (S.F. # 32.) The port of Xingang is in a "summer zone." (Moundreas Dep. 279–80.) Nikos Christodoulatos testified at his deposition that the SATURN II's summer load line mark was the maximum draft to which the vessel could be loaded with respect to this voyage. (N. Christodoulatos Dep. 232–33.) Mr. Christodoulatos stated that the SATURN II's maximum summer draft, according to the charter party, was 12.85 meters. He conceded that the SATURN II would be overloaded if it went above that figure. (*Id.* at 233.) According to a draft survey, the mean draft of the SATURN II was 12.920 meters when the vessel left Xingang. (Ex. 115.) A stowage plan put the draft at 12.915 meters. (Ex. 117.) Either number is above the maximum summer draft. MSM's superintendent engineer, Mr. Moundreas, testified that the measurements would be subject to a 0.5% margin for error, the salinity of the water and the removable onboard water ballast. (Tr. 1834–35.) He testified that with these factors taken into account, the SATURN II was at its summer load line upon departure from Xingang. (Tr. 1842.) Mr. Moundreas was not credible enough as a witness for the Court to take his testimony

at face value. (*See infra,* Part IV.C.) The Court finds that the SATURN II was overloaded at the beginning of the voyage.

On May 28, 2002, the SATURN II departed Xingang for its ultimate destination of Dahej, India. (S.F. #32.) From June 8, 2002 through June 10, 2002, the vessel anchored outside the port limits of Singapore in order to effect a crew change and obtain supplies. (S.F. #33.) On June 8, at Singapore, Captain Manuel Padayhag assumed command of the vessel from Captain Eustaquio Pereja. (S.F. #34.) There is some question as to whether the turnover of command to Captain Padayhag was proper. Captain Padayhag claimed at deposition and in his affidavit that Georgios Petsinis, the crew manager at MSM at this time, forced him to sign a protocol for the change of command. (Padayhag Dep. 8; Padayhag Aff. ¶7.) While the propriety of the command turnover, in and of itself, is not significant, the incident is consistent with Mr. Petsinis's behavior after the grounding. On several occasions, he commanded SATURN II crew members to engage in questionable activities with respect to ship documents and records.

While at Singapore, the SATURN II received some 100 metric tons of fresh water and 700 metric tons of fuel oil and diesel oil. (S.F. #35.) On June 10, 2002 at about 8:20 P.M. local time, the SATURN II departed the outer anchorage at Singapore bound for Dahej. (S.F. #36.) Captain Padayhag testified that the SATURN II had a forward draft of 12.80 meters and an aft draft of 13.25 meters, for a mean draft of 13.025 meters. (Padayhag Aff. ¶10; Padayhag Dep. 46) The draft now was even greater than it had been at Xingang. Dahej also was in the summer zone. (Moundreas Dep. 280.) With its mean draft above 12.85 meters, the SATURN II was overloaded at the most critical stage of its voyage.

## B. The SATURN II's Cracked Cylinder Liner

On June 15, 2002, a 17 to 22 inch crack developed in the No. 6 cylinder liner of the vessel's main engine. (Padayhag Dep. 153–54; Tr. 818.) This incident caused the SATURN II to stop at 6:30 A.M. local time in order for the crew to address the accompanying fire. (Ex. 140 at P 3816.)[11] The voyage was resumed at 12:00 noon. (*Id.*)[12] Unfortunately, the crack in the liner caused the vessel's fresh water to leak. (Tr. 818; Padayhag Dep. 155.)[13] The crew of the SATURN II could have utilized the fresh-water evaporator to replace the lost fresh water. (Tr. 814.) Captain Padayhag and Chief Engineer Rogelio Santos testified, however, that the ship's fresh-water evaporator did not function when the vessel was loaded. (Ex. 129, ¶6; Ex. 132, ¶12.) The SATURN II had to depend on outside sources to replace the lost water. (*Id.*)

Stavros Trimis testified as to the reason that the cylinder cracked. Mr. Trimis, a former seagoing chief engineer, was the senior surveyor at Evdemon. The underwriters retained Evdemon to inspect the SATURN II after the grounding. (Tr. 777–83.) Mr. Trimis testified that the No.

---

11. The Court reserved decision on the admissibility of Exhibit 140 pending connection to Captain Padayhag's deposition. (Tr. 1232–33.) Having read the deposition, the Court now overrules defendants' objection and receives Exhibit 140.

12. There is conflicting evidence that the SATURN II resumed its voyage at 12:00 midnight (17½ hours later), not at noon. (*See* Moundreas Dep. 158–59.) This fact is not significant.

13. Defendants' objections at lines 15–16 of page 155 of Captain Padayhag's deposition are overruled.

6 cylinder was afflicted with a condition he termed "excessive ovality." (Tr. 841, 846.) According to the No. 6 engine cylinder inspection report dated March 26, 2001, the original liner dimension for the cylinder was 760 millimeters in diameter. (Ex. 116–2; Tr. 847.) Mr. Trimis testified that according to his experience, this kind of engine is allowed a maximum "ovality" (i.e. deviation) of no more than "two per thousand" (i.e. two millimeters for every 1000 millimeters). (Tr. 846.) Mr. Trimis explained that the measurement is the diameter across the cylinder, measured from forward to aft and from port to starboard. (Tr. 847.) On the March 26, 2001 report, seven measurements from seven positions were taken forward-to-aft, and seven were taken from port-to-starboard. (Ex. 116–2.) The measurements from positions 2, 3, and 4—both forward-to-aft and port-to-starboard—exceeded 762 millimeters. (Ex. 116–2; Tr. 848.)

If Mr. Trimis's analysis is correct, the walls of the No. 6 cylinder interior had thinned, leading to an increase in interior diameter and the eventual crack. The only problem with this analysis is that there is evidence that Chief Engineer Santos rewrote portions of the March 2001 engine cylinder report (Ex. 116–2) at the behest of MSM. (*See infra*, Part IV.B.) Mr. Trimis himself testified that Chief Engineer Santos told him as much. (Tr. 823.) Mr. Trimis based his calculations on the March 2001 report. (Tr. 848.) These calculations, therefore, are not entirely reliable. In any event, what is important is not how the cylinder cracked, but that the SATURN II was leaking fresh water as a result of the crack.

The cracked cylinder and the out-of-commission fresh-water evaporator meant that the SATURN II would have to acquire fresh water from an external source. Captain Padayhag testified at deposition

that on June 17, 2002, he requested permission from MSM to stop at Trincomalee, Sri Lanka in order to obtain water. (Padayhag Dep. 102.) The owners denied permission on the ground that no fresh water was available in that port, a contention that Captain Padayhag disputes. (*Id.*) On June 19, 2002, Captain Padayhag requested a stop at Cochin, India for the same reason. (*Id.*) MSM denied permission on the same ground and additionally because of the SATURN II's draft. (*Id.*; Ex. 121.) The SATURN II was out of fresh water by noon on June 23, 2002. (Ex. 121.) Captain Padayhag testified at deposition that MSM was aware of the situation and directed him to proceed to Dahej anyway. (Padayhag Dep. 230, 275.)

### C. *The Grounding*

On June 22, 2002, the time of inception of the H & M policy, the SATURN II was en route to Dahej. Three days later on June 25, 2002, the SATURN II grounded off the west coast of India in the Malacca Banks near the Grant Channel. (S.F. # 37.) This area was in the summer load line zone. (Padayhag Dep. 174.) The blame for the grounding is a complicated matter. Plaintiffs desire the Court to find the owners at fault for ordering Captain Padayhag to take the SATURN II into the Grant Channel despite the overloaded condition of the vessel and the lack of fresh water. Defendants want the blame placed solely at the feet of Captain Padayhag. The Court is inclined to believe the Captain's testimony that MSM was fully aware of the problems aboard the SATURN II, yet ordered the vessel to proceed. (Padayhag Dep. 230, 275.) Captain Padayhag testified that had he received no instructions, he would not have proceeded. (*Id.* at 275.)

On the other hand, Defendants' navigational expert, Captain John Lawrence Bergin, criticized some of Captain Padayhag's

decisions once the SATURN II entered the Grant Channel area. Captain Bergin's criticisms fall into three categories: (1) the SATURN II should not have been in the Western Bank area, which is just southeast of the Grant Channel, (2) the SATURN II got under way too early on June 25, 2002 and (3) Captain Padayhag should have communicated with Chief Engineer Santos to ensure that everything was in working order. (Tr.1983.) The Court disagrees as to (3) because the evidence demonstrates the likelihood that both men knew about the compromised condition of the No. 6 cylinder. Captain Bergin was not aboard the ship, and he is speculating as to the nature of the conversations, if any, between the master and the engineer.

The other two criticisms may have some merit, but they strike the Court as Monday morning quarterbacking. Captain Padayhag was instructed by the local ship's agent to get under way three hours before high tide at Pipavav, a city on the western bank of the Grant Channel. (Ex. G–15; Tr.1985.) That would have been 12:25 P.M. on June 25, 2002. The SATURN II already was north of Pipavav at that time. Captain Bergin testified that Captain Padayhag should not have been in that shallow area in the first place. (Tr.2005.) Once there, he should have waited an extra hour after 12:25 in order to gain the tide. (Tr.1985.) Instead, the SATURN II lifted anchor at 11:40 A.M. before the water depth had increased. (Tr.1985.) Ten minutes later, Chief Engineer Santos stopped the engine because of the lack of water. The SATURN II thereupon grounded for the first time that day. (Tr.1989.) According to Captain Bergin, the vessel would have run aground even without the engine difficulties because Captain Padayhag lifted anchor too early.

Chief Engineer Santos testified at deposition that Captain Padayhag never told

him about the first grounding. (Santos Dep. 82.) He testified that if he had known, he would have cleaned the mud from the cooling system so that the engine would not overheat. (*Id.*) The implication is that the Captain Padayhag's error, not the cracked cylinder, resulted in the engine failure later in the day. The Court discounts Mr. Santos's testimony. Captain Padayhag testified that the "deck and engine crew immediately mobilized to deal with the [grounding]." (Padayhag Dep. 100.) Captain Padayhag's scenario is the more likely of the two.

At 12:45 P.M., the tide came in and the vessel floated free. (Tr.1992.) This fact corroborates Captain Bergin's view that 11:40 was too early for the SATURN II to lift anchor. The SATURN II now had a "mulligan" so to speak. It would be getting under way again within a few minutes of 1:25 P.M., the time that Captain Bergin specified. The SATURN II resumed its northeasterly course toward the Grant Channel until 2:30 P.M., when the engine stopped again. (Tr.1993.) At 2:37 P.M., the SATURN II dropped anchor. (Tr. 1995.) According to Santos's deposition, the SATURN II was ready to proceed at 5:00 P.M. Nevertheless, Captain Padayhag kept the vessel anchored. At 7:17 P.M., the SATURN II settled solidly onto the bottom near latitude 20°55′N, longitude 71°55′E. (Tr.1997–98; Ex. H–15.)

Given the cracked engine cylinder and the lack of fresh water, the Court is not inclined to second-guess Captain Padayhag's decision not to move his ship, despite Chief Engineer Santos's testimony that the ship was ready to go at 5:00 P.M. Additionally, Captain Padayhag offered undisputed testimony that the currents in the area were "very confusing." (Padayhag Dep. 227.) Captain Bergin made no independent effort to determine the force and direction of the wind and seas experi-

enced by the SATURN II on the day of the groundings. (Tr.2027.) Captain Bergin also conceded that he had not inspected the SATURN II's deck logs because of allegations that they had been altered. (Tr.2009.) He relied on the predicted tidal tables but did not perform any calculations to determine whether the predicted tidal data coincided with actual tidal conditions. (Tr.2019–20.) After considering all of the evidence, including the credible testimony of both Captain Padayhag and Captain Bergin, the Court finds that the fault for the grounding lies with the owners and not with Captain Padayhag.

## IV. THE AFTERMATH OF THE VOYAGE—THE COVERUP

### A. *Post–Grounding Communications*

After the grounding, Captain Padayhag sent a message to MSM stating: "M/E [main engine] stop due to no more fresh water at M/E—vsl drifted to shallow water and ran aground." (Ex. 140.) MSM responded: "FYI DON'T ALLEGE TO ANY PARTY THAT REASON FOR GROUNDING IS LACK OF FW [fresh water] AND ADVISE YOUR OFFICERS/ENGINEERS ACCORDINGLY." (Ex. 140.) MSM further instructed Captain Padayhag not to move and to send the following message to the local agent that had provided the SATURN II with the tidal information: "ADVISE NEXT HIGH TIDE AS AT OUR ANCHORED PSTN THE INDICATED TIDE TABLE INFORMATION YOU PROVIDED U.S. IS INCORRECT AND FOR SAFE NAVIGATION PURPOSES SHALL WAIT FOR NEXT HIGH TIDE." (Ex. 140 at P 3909.) The Court believes that this message was a directive to the Captain to lie to the local agent. It shows the beginning of an MSM coverup.

The Court does not use the word "coverup" lightly. Other evidence compels this view. Later on June 25, MSM sent a "personal" message to Captain Padayhag which said in part:

AS SEEMS PER DRAFT VSL OVERDRAFT DO DONT DECLARE TO NOBODY YOU HAVE TO READJUST BY DEBALLAST IF ANY ? ? OR YOU HAVE TO DECLARE MAX DRFT 12.85M ... TRY AMEND AND ALL TLX/EMAILS/LOGS SHUD READ NO MORE THAN 12.85M—CNFM BY RETURN AND ALL RELEVANT EMAILS/TLX/DOCS FM COMMENCEMENT OF VOY THROW AWAY.

(Ex. 140 at P 3893; Padayhag Dep. 129–30.) Captain Padayhag responded: "ryt all noted. Draft cannot be readjusted no ballast on board." (Ex. 140 at P 3894; Padayhag Dep. 131.) MSM further directed Captain Padayhag to advise the local agent that the SATURN II's maximum draft was only 12.70 meters and to "CORRECT ALL DOCS/LOGS/MSGS IN LINE WITH ABOVE N ALWAYS KEEP LESS THAN MAX SUMMER DRFT." (Ex. 140 at P 3896; Padayhag Dep. 132.) In the Court's view, these messages from MSM to the ship are nothing short of damning on the draft issue. They show conclusively that MSM knew that the vessel was overloaded when it proceeded toward the Grant Channel.

On June 26, 2002, in a "personal n confidential" message, MSM directed Captain Padayhag: "WHEN DARK DISCH ABT 150 MT AT SEA W/OUT BEING NOTICED—THEN TRIM SURFACE AND CLEAN DECK." (Ex. 140 at P 3905; Padayhag Dep. 135–36.) Captain Padayhag testified that Gerassimos Christodoulatos, Nikos's father, gave him similar instructions over the phone. (Padayhag Dep. 49–

50.)[14] On June 27, MSM instructed Captain Padayhag to send a message to the local agent stating "VSL HAS NOT ANY ENGINE PROBLEM FM THE TIME VSL ARRIVED AND ANCHORED" and further instructed "FM NOW ON DON'T CNFM BACK OUR MSGS N WHEN U SEND MSG DON'T REF TO OUR LAST IE. 'RYL' OR 'RYT' ETC JUST ONLY SAY WHAT YOU HAVE TO SAY." (Ex. 140 at P 3905; Padayhag Dep. 137–38.) Following MSM's instructions, Captain Padayhag discharged cargo over the side and discarded some, but not all, of the SATURN II's documents. (Padayhag Dep. 129–36.)

## B. *Altered Documents and the Destroyed Computer*

Mr. Petsinis, then the crew manager at MSM, arrived at the grounded ship on July 2, 2002, ten days before the salvor, Tsavliris Russ Limited, refloated it. (Tr. 1429, 1433.) This visit lasted until the middle or end of August. (Tr. 1434.) Michael Petrakakos, MSM's technical consultant, also was on board at various times during this period. (Tr. 548, 982, 993, 1368–69, 1552, 1556.) These two gentlemen continued the coverup. Mr. Petsinis burned the original deck and engine logbooks of the SATURN II, together with other ship documents including incoming and outgoing telexes, emails and faxes, bell books, loading plans and voyage documents in Captain Padayhag's files, and monthly maintenance reports prepared by the ship's engineers. (Ex. 123 at P 3392; Ex. 129 at P 3623; Ex. 131 at P 3736; Ex. 120–2; Ex. 155 (Santos Dep. (9/25/03) 199, 206 (9/26/03) 38–39, 45); Padayhag Dep.

20–21, 30–31, 57–58, 82–83, 106; Tr. 792–97, 800–02, 808, 823–24, 898, 940–41.) Mr. Petsinis also removed parts from the SATURN II's computer, which was used to calculate load, ballast and strength conditions for the vessel. (Ex. 129 at P 3622; Ex. 120–3 (photograph of disassembled computer); Ex. 120–4 (same); Padayhag Dep. 53; Tr. 811.)[15] It does not take a genius to figure out Mr. Petsinis's motive for destroying the computer. Most of the written communications between MSM and the SATURN II were by email. (Tr. 806–07, 1408–10.)

Captain Padayhag testified several times at deposition that Mr. Petsinis instructed him to rewrite the SATURN II's deck log. (Padayhag Dep. 24–25, 28–29, 44; Ex. 129.)[16] Captain Padayhag said the same thing in his master's report of August 21, 2002, written while he was still aboard the ship. (Ex. 123.) The Captain also testified that Mr. Petsinis instructed Chief Engineer Santos to rewrite the SATURN II's engine log. (Padayhag Dep. 29–31.)[17] Mr. Santos confirmed Captain Padayhag's testimony on this point. (Ex. 130.) Mr. Trimis also offered testimony to this effect. He testified that he went to the MSM offices in August 2002 and that Gerassimos Christodoulatos gave him one deck logbook and three engine logbooks for inspection. (Tr. 784–86.) They were represented as originals, but they were written in pencil and not in ink Mr. Trimis expected. (Tr. 786–87, 789, 791.) Later in 2002, Mr. Trimis went to the Philippines and spoke to certain crew members of the SATURN II who had been repatriated. (Tr. 792.)

14. The objections to the questions on pages 49–50 of Captain Padayhag's deposition are overruled.

15. The objections at lines 7–8 of page 53 of Captain Padayhag's deposition are overruled.

16. The objection at line 7 of page 44 of Captain Padayhag's deposition is overruled.

17. The objections at lines 1–2 of page 30 of Captain Padayhag's deposition are overruled. The objection at line 3 of page 31 also is overruled.

Some of those individuals informed him that original ship documents had been destroyed and logbooks fabricated. (Tr. 793.) When Mr. Trimis boarded the SATURN II in December 2002 with copies of the "original" ship's log, Captain Padayhag told him that the true original differed from those copies. (Tr. 794.) Captain Padayhag also told Mr. Trimis that Mr. Petsinis had burned certain documents. (Tr. 794–96.) On the same visit, Chief Engineer Santos told Mr. Trimis that the original logbooks differed from his copies and that Mr. Petsinis had taken the originals. (Tr. 796–97, 799; Ex. 106.)

Other documents were altered or destroyed. Chief Engineer Santos stated in his affidavit that Messrs. Petsinis and Petrakakos instructed him to retype the SATURN II's monthly maintenance reports and to delete entries in those reports which identified certain problems with the vessel's machinery. (Ex. 130 at P 3736.) Mr. Trimis testified that Santos told him the same thing. (Tr. 821.) Mr. Petsinis also instructed Santos to rewrite the "Monthly Running Hours Report" for all months after November 2001 and rewrite the engine bell book in order to change entries that referenced the grounding. (Ex. 130 at P 3737.) Captain Padayhag stated that Mr. Petsinis destroyed the original bell book. (Padayhag Dep. 183–84.) Finally, Santos created an "M.E. Cylinder Inspection Report," dated March 26, 2001, for the No. 6 cylinder of the main engine. (Ex. 131 at P 3737)[18] Mr. Petrakakos told Santos what to put in the document. The measurements of the liner were not actual measurements, but those fabricated by Mr. Petrakakos. (*Id.*) Santos told all of the foregoing to Mr. Trimis while Mr. Trimis was aboard the SATURN II. (Tr. 821–23.) According to Captain

Padayhag, Messrs. Petsinis and Petrakakos took the rewritten deck log when they disembarked from the SATURN II in August 2002. (Ex. 129 at P 3624.) Chief Engineer Santos testified at deposition that he gave Mr. Petsinis the original and rewritten versions of the engine log. (Santos Dep. 206–07.)

### C. *The Bag and the Envelope*

Mr. Petsinis testified that Captain Padayhag gave him a sealed plastic envelope to be delivered to the MSM office. (Tr. 1497.) Mr. Petsinis says that he put this envelope in his bag with some of his personal effects. (Tr. 1497–98.) On his way back to Greece, Mr. Petsinis checked the bag with the airline. (Tr. 1498.) When he arrived back in Greece, he went directly to the MSM office. (Tr. 1500.) Mr. Petsinis testified on direct that upon opening the bag, he discovered that the envelope had been unsealed and that some of his personal items were missing. (Tr. 1501.) On cross, however, he testified that he left the bag with "someone" at the office, but he could not remember whom. (Tr. 1640.) More importantly, he testified that he did not open the bag. (*Id.*) When the Court pressed him on the inconsistency, Mr. Petsinis claimed that he learned the next day that two logbooks were missing from the envelope, but he did not remember who told him. (Tr. 1646, 1649.) He had testified on direct, however, that Mr. Moundreas or Nikos Christodoulatos told him that some logbooks from the SATURN II were in the envelope. (Tr. 1505–06.)

Mr. Moundreas's version of the same events varies from Mr. Petsinis's story. Mr. Moundreas testified that he and Nikos Christodoulatos had given instructions to Mr. Petsinis before his trip to the SATURN II. (Tr. 1849.) They told Mr. Petsin-

---

18. The altered documents are Exhibits 104 (deck log), 106 (engine log) and 107 (bell book). The fabricated "M.E. Cylinder Inspection Report" is Exhibit 116–2.

is "to tell the captain to collect all of the documents which I reference [sic] from that trip of China to India, and to bring it back to us." (Tr. 1850.) Mr. Moundreas testified that when Mr. Petsinis returned, he left a pile of documents on a secretary's desk. (Tr. 1851.) This testimony contradicts Mr. Petsinis's claim that he never opened the bag. Mr. Moundreas testified rather incredibly that he never looked at the documents and that he did not know to whom the secretary gave them. (Tr. 1852.) He then testified that Mr. Petsinis told him which documents were in the pile (Tr. 1854–55.) This is inconsistent with Mr. Petsinis's testimony.

Nikos Christodoulatos's testimony on this subject is no more illuminating. When asked how MSM came into possession of the deck log and engine log (Exhibits 104 and 106), Mr. Christodoulatos guessed as to the former that the ship sent it, and could not remember as to the latter. (Tr. 1412.) He also testified that these were not the original deck and engine logs and that he did not know what happened to the originals. (Tr. 1411.) He also could not explain why MSM did not send the original deck log and engine log to HBI for forwarding to the underwriters. (Tr. 1414.) He claimed only that he sent the logs that MSM had in possession. (Tr. 1414.) Chief Engineer Santos testified at deposition that he did not know what happened to the original engine log, but later he said he gave it to Mr. Petsinis along with the re-written log. (Ex. 151 at 199–206.)

The only thing that the Court can say for sure about the SATURN II's books and documents is that they are hopelessly compromised as a result of defendants' actions. If defendants intended to confuse the post-grounding investigation, they more than succeeded.

### D. *The Abandonment and Scrapping of the SATURN II*

Mr. Petsinis testified that he arrived back in Athens, Greece on August 25, 2002. (Tr. 1612.) The Court will give Mr. Petsinis the benefit of the doubt on that statement. Before Mr. Petsinis's return, MSM, on behalf of Endeavour, notified the plaintiff insurers that Endeavour was abandoning the SATURN II and claiming her insured value. (S.F.# 42.) In the notice of abandonment, dated August 8, 2002, MSM stated in part:

> According to our various messages, we believe the vessel's hull structure has sustained permanent longitudinal and transverse deformation whilst the bottom plating starboard side ... is damaged severely and far more extensively than anticipated.
>
> In view of the foregoing, we concur with owner's consultant opinion that repairs in order to restore the vessel in her original condition as before the casualty are not viable as the cost and ancillary expenditures shall exceed insured value.

(Ex. 47.) The last sentence indicated MSM's belief that the SATURN II was a constructive total loss ("CTL") under the policy. In August 2002, the salvor, cargo receiver and others arrested the SATURN II in India. (S.F. # 47.)

### V. THE INSURERS' INVESTIGATION

#### A. *Assessment of the Damage*

AI Marine investigated the SATURN II insurance claim on behalf of all plaintiff insurers. (S.F.# 43.) The claims handler responsible for the file was Vincent Corteselli. (Tr. 952.) Mr. Corteselli sent MSM and Endeavour a reservation of rights letter dated August 19, 2002. (Ex. 49; Tr. 953, 1099–1100.) He informed MSM and Endeavour that the insurers would investigate whether the H & M

policy was void *ab initio* because facts material to the risk were not disclosed during placement of the policy, or because the SATURN II was unseaworthy at the inception of the policy. (Ex. 49.) In addition, the insurers intended to investigate whether the SATURN II was unseaworthy when the voyage at issue commenced. (Ex. 49.) The letter requested that MSM and Endeavour provide documents such as the deck and engine logbooks and maintenance records. (Ex. 49.) The insurers also declined MSM's August 8, 2002 notice of abandonment, thereby putting MSM and Endeavour on notice that they remained responsible for the SATURN II. (Ex. 49; Tr. 953–54.)

On the same day, August 19, 2002, Mr. Corteselli faxed a letter informing MSM's broker, HBI, that the insurers had approved Endeavour's retention of the English law firm Clyde & Co. (Piraeus, Greece office) on the salvage issue. (Ex. D–17; Tr. 418, 954–55, 1211.)[19] Clyde & Co. had agreed to represent Endeavour subject to the insurers' approval of the retention and guarantee of payment. (Ex. 102; Tr. 418–20, 426–27, 434, 443–44.) In the same communication, Mr. Corteselli confirmed the appointment of the Salvage Association, an H & M surveying firm, to assess the damage to the SATURN II. (Ex. D–17; Tr. 525, 529.) He also indicated that AI Marine had appointed the London law firm of Waltons & Morse ("Waltons") to act on behalf of the underwriters with respect to unseaworthiness and the issue of whether the policy was void *ab initio*. (Ex. D–17; Tr. 955.) Finally, Mr. Corteselli notified HBI that the underwriters would appoint Evdemon (Mr. Trimis's firm) to assist Waltons in its inquiry. (Ex. D–17; Tr. 783, 955.)

As part of the investigation, William Johnstone, a principal surveyor with the Salvage Association, visited the SATURN II on three occasions: August 20, 2002, October 14, 2002 and January 13–14, 2003. (Tr. 525, 531–32, 956–57.) The SATURN II was loaded with its coal cargo for Mr. Johnstone's first two trips. The cargo was discharged before the third. (Tr. 561.) During the first visit, Mr. Johnstone inspected the vessel with Mr. Petsinis and Mr. Petrakakos, who showed Mr. Johnstone the damaged areas. (Tr. 532–34.) Messrs. Johnstone and Petrakakos signed a joint Field Survey Report setting forth their joint findings on a without-prejudice basis. (Ex. 83; Tr. 534–38.) Mr. Johnstone prepared a typed version of that report, titled "Advice No. 7." He shared the report with Mr. Corteselli. (Ex. 84; Tr. 539, 957.) Mr. Corteselli testified that even though the Advice was titled "No. 7," it was the first time that AI Marine had received firsthand information from a witness who had been aboard the SATURN II. (Tr. 957.)

As was clear from their notice of abandonment, the owners were claiming that the SATURN II was a CTL. Mr. Corteselli found the information in the Advice significant because it did not support the owners' CTL claim. (Tr. 957–58.) Mr. Johnstone commented in the Advice:

> The owners have claimed that the vessel is twisted. Their evidence appears to show this is the case, however it is based on freeboard readings taken on location where it is unlikely to be calm enough to give truly accurate readings. Also as the vessel is heavily loaded this may influence readings. Further evidence of twisting/hogging sagging is necessary, either in drydock or in calm location.

**19.** Mr. Corteselli erroneously dated the letter August 19, 2000. The facsimile tagline at the bottom of the page reflects the correct date: August 19, 2002. (Ex. D–17.)

(Ex. 84 at P 0065.)[20] In a subsequent report dated August 28, 2002, Mr. Johnstone stated as follows:

> The owners have alleged that the hull is twisted. Freeboard readings have been taken and indicate that the hull is sagged and that there is misalignment of the vessel from frame 143 to aft. The readings were taken by the owners [sic] consultant, however the actual conditions of the sea etc. at the time of measurement is not known and accuracy cannot be verified.
>
> . . . .
>
> We recommend that freeboard readings are taken again with the cargo discharged and in clam [sic] waters, as the weight and position of the cargo could be displacing the vessel hull to some extent.

(Ex. 86 at P 0094.) In the August 28 report, Mr. Johnstone opined that repairs likely would cost approximately $2 to $3 million. (Ex. 86 at P 0096.) These figures were well below the SATURN II's agreed value of $7,500,000. In other words, the SATURN II would not be a CTL under the policy. Mr. Johnstone maintained this view after his two subsequent visits of the vessel. (Tr. 541.)

After Mr. Johnstone's August 20 inspection and Mr. Petsinis's return to Greece, Mr. Trimis of Evdemon went to the MSM office in Piraeus, Greece to inspect certain documents. (Tr. 782–83.) Mr. Trimis testified credibly that he visited MSM several times in August and September 2002, and the only person he dealt with was Gerassimos Christodoulatos. (Tr. 784.) Gerassimos Christodoulatos gave Mr. Trimis several logbooks which were represented as originals. (Tr. 786.)[21] These books in actuality included the deck and engine logs that were rewritten by Captain Padayhag and Chief Engineer Santos pursuant to Mr. Petsinis's instructions. (Ex. 104, 106; Tr. 786–89, 797, 822.) Mr. Christodoulatos also gave Mr. Trimis the rewritten main engine cylinder inspection report for the No. 6 cylinder, dated March 26, 2001, and the rewritten monthly hours reports for May and June 2002. (Ex. 116-2; Tr. 822–23.) Mr. Trimis noticed what he believed to be certain anomalies in the documents and reported such to Mr. Corteselli. (Ex. 51; Tr. 787–88, 965–66.)

On September 16, 2002, MSM and Endeavour, through HBI, provided Mr. Corteselli with what were presented as copies of the SATURN II's original deck and engine logs. They actually were the rewritten logs. (Ex. 42, 52, 104, 106; Tr. 967–70, 1413–14.) As of October 7, 2002, Mr. Corteselli was of the opinion that the SATURN II "probably" was a CTL, and he so informed Mr. Hall of Clyde & Co. by fax. (Ex. R–6.) Mr. Corteselli directed Messrs. Johnstone and Trimis to go to the ship and investigate. (Ex. 42; Tr. 965–67, 985, 1413–14.) On October 14, 2002, Messrs. Johnstone and Trimis boarded the SATURN II with Messrs. Petsinis and Petrakakos. (Tr. 547, 825, 945.) Mr. Johnstone took freeboard readings and inspected the deck, ballast tanks and engine room. (Tr. 548–49.) He testified that the condition of the SATURN II surprised him because it was similar to the condition of the vessel back in August. (Tr. 549.) He expected

---

**20.** "Hogging" and "sagging" are nautical terms. A vessel is said to be hogging when it droops at the ends. A vessel is sagging when it droops between the ends. A simple illustration would be the depiction of the mouth in a young child's drawing of a happy face (sagging) and a sad face (hogging).

**21.** This testimony debunks Nikos Christodoulatos's statements that his father had nothing to do with the SATURN II. (Tr. 1244.)

to see significantly more damage on the second visit because Mr. Petrakakos had advised him that the vessel was breaking up. (*Id.*) Contrary to the owners' contentions, Mr. Johnstone saw no evidence that the SATURN II was permanently twisted or that the ship's bottom was damaged. (Tr. 549–52.)

After his visit, Mr. Johnstone prepared a report dated October 15, 2002. (Ex. 89.) He also prepared an addendum to this report on October 29, 2002. (Ex. 90.) The evidence is clear that the addendum was forwarded to Mr. Corteselli (Tr. 986) but not so clear as to the original report. In any event, Mr. Johnstone stated in the October 15, 2002 report: "As regards Total Constructive Loss, the comments in our report in August remain valid. There is still insufficient evidence of a TCL at full value...." (Ex. 89 at P 1301; Tr. 550–53.) In the addendum, Mr. Johnstone stated:

> The owners allege that the vessel is twisted and that removing the twist will require major steelwork repairs. They have based their allegation on freeboard readings.
>
> . . . .
>
> In our opinion, however, the freeboard readings taken cannot be relied upon to judge any permanent twist and deflection of the vessel ·. . . .
>
> . . . .
>
> In our opinion, the alleged vessel twist or deflection can only be verified by actual visual indication of distorted steelwork, *i.e.,* after full survey of the damaged areas after all cargo and ballast has been removed from the vessel.

(Ex. 90 at P 1041–42.) Mr. Johnstone also listed several reasons that his freeboard readings from October were unreliable. He noted, for example, that the vessel (1) was located in a position with strong currents, (2) was overloaded due to full cargo and additional ballast water resulting from

flooding and list correction, (3) the disposition of the cargo was not known and (4) any temporary hull distortion in the hull would be corrected once the cargo was removed. (Ex. 90 at P 1042.) Mr. Johnstone testified that he was using a spliced tape measure given to him by Mr. Petsinis and that he had to deduct the missing distance. (Tr. 557–58.) This evidence shows that it is more likely than not that the freeboard readings from October were not reliable.

### B. *Crew Interviews*

During the October 2002 visit, Mr. Petrakakos introduced Mr. Trimis to Captain Padayhag and Chief Engineer Santos. Both Mr. Trimis and Mr. Petrakakos told these officers that Mr. Trimis represented the ship's H & M underwriters. (Tr. 825–26.) Mr. Trimis interviewed the captain and engineer in the presence of Messrs. Petsinis and Petrakakos. (Tr. 827.) Mr. Trimis testified that most of his questions elicited the answer, "I don't know." (*Id.*) Mr. Petsinis asked him not to press the officers. (*Id.*) After a few more "I don't knows," Mr. Trimis realized that he would not be able to get meaningful statements from the officers that day. (*Id.*)

By early November 2002, nineteen of the SATURN II's twenty-three man Filipino crew had been repatriated to the Philippines; thereafter, the only original crew members remaining on the ship were Captain Padayhag, Chief Officer Manuel Duterte, Chief Engineer Santos and Second Engineer Palacio Godofredo. (S.F. # 45.) In mid-November 2002, Mr. Corteselli instructed Mr. Trimis and Richard Stone, Esq. of Waesche Sheinbaum & O'Regan P.C., the underwriters' coverage counsel, to interview willing former members of the SATURN II's crew in Manila. (Tr. 501–02, 1020–21.) Messrs. Trimis and Stone interviewed six former crew members, in-

cluding Captain Padayhag's predecessor as master, Captain Pereja. (Tr. 501, 1110.) At Mr. Corteselli's request, Andrew Malpass of Aquila assisted in coordinating the interviews. (Tr. 500–01; Ex. 64–65.) Mr. Malpass testified that these crew members were compensated for reasonable time and expenses. (Tr. 511–13.) None of them were called to testify in this action.

As a result of Manila interviews, Mr. Corteselli decided that it was necessary to interview the four officers still aboard the SATURN II to confirm allegations that logbooks had been destroyed or perhaps rewritten. (Tr. 1022–23.) Mr. Corteselli asked Messrs. Trimis and Stone to interview the officers and perhaps get statements, if they were willing. (Tr. 1027–28.) Mr. Corteselli did not ask the owners of the SATURN II for permission to allow Messrs. Trimis and Stone to board the ship. (Tr. 1028.) On December 5, 2002, Messrs. Trimis and Stone boarded the SATURN II for the interviews, along with two representatives from Charles Taylor Consulting ("CTC"). (S.F. # 46; Tr. 883–85, 1029.) CTC had been acting on behalf of the cargo interests. The ship's officers signed several statements that were handwritten by Mr. Stone contemporaneously with the various interviews. (Tr. 836–37, 890–91.) While the Court has serious doubts about the propriety of these *ex parte* interviews, Mr. Corteselli probably was correct to think that informing the owners would have been counterproductive to uncovering the truth behind the logbooks and records. (Tr. 1028.)

When the four officers finally left the SATURN II in mid-January 2003, they met Messrs. Trimis and Stone again in Bombay, India. The crew members signed typed versions of their December statements before a U.S. consular officer. (Tr. 830, 1040–41; Ex. 129–32.) The statements, among other things, confirmed the destruction and rewriting of the ship's deck and engine logbooks and other ship documents. The statements also provided information that Mr. Petsinis had destroyed the ship's computer. (Ex. 129–31; Tr. 1042–43.) Chief Engineer Santos claimed at deposition that Messrs. Trimis and Stone offered to pay him in return for his cooperation. (Santos Dep. 105–06.) Mr. Trimis emphatically rejected this contention at trial. (Tr. 895–96.) The Court is inclined to credit the testimony of Mr. Trimis, the more believable witness of the two. There is no credible evidence that the underwriters, Mr. Corteselli, Mr. Stone or Mr. Trimis paid any money to Captain Padayhag, Chief Officer Duterte, Chief Engineer Santos or Second Engineer Godofredo. (Tr. 889–90, 895–96, 1059.)

## VI. CARGO DISCHARGE AND DECLINATION OF COVERAGE

### A. *Negotiations with the Cargo Interests*

On or about October 25, 2002, the salvor abandoned the SATURN II. (S.F. # 44.) At that time, the SATURN II was still at an anchorage near Bhavnagar, India. (*Id.*) Mr. Johnstone testified that he believed the SATURN II to be in an unsafe condition and that he passed along this opinion to Mr. Corteselli. (Tr. 560.) Mr. Johnstone believed that the cargo on board caused additional stress within the vessel structure leading to the risk that the vessel might drag anchor and drift, and that the vessel was vulnerable to flooding because it had no power. (Tr. 560–61.) In a facsimile dated October 29, 2002, John Dolias of HBI sent a fax to Mr. Corteselli informing him that "the owners have decided to abandon the voyage at Bhavnagar to the cargo receivers effective as of [October 25, 2002]." (Ex. 67.) Mr. Corteselli in reply urged the owners to find an alterna-

tive tug to stand by the vessel in the event the salvor's tug departed and a replacement was not sent. (Ex. 68.) Mr. Corteselli was concerned because the SATURN II was sitting one-and-one-half to two hours away from shore with no assistance for the crew. (Tr. 1002.) The owners never hired another tug to stand by the SATURN II. (Tr. 1002.)

As stated in the previous section, CTC acted on behalf of the cargo interests. (Tr. 992.) Alex Pinto was the individual at CTC who was primarily involved with the SATURN II. (Tr. 991–92.) On November 1, 2002, Mr. Corteselli called Mr. Pinto. Mr. Corteselli was concerned because several months had passed since the grounding, but nothing had changed with the ship. (Tr. 1005.) Mr. Hall of Clyde & Co. advised Mr. Corteselli that the only solution to get the cargo off the ship was to come to an arrangement with the cargo interests whereby the costs of the discharge would be split between the ship and the cargo interests. (Tr. 425.) Mr. Pinto said that the discharge would cost in excess of $1 million, and once the salvage tug departed the SATURN II, he was demanding $400,000 in contribution from the owners and H & M insurers. (Tr. 426, 1009.)

In early December 2002, Mr. Corteselli agreed on behalf of the plaintiff underwriters to contribute $380,000 toward the costs of discharging the SATURN II's cargo. (Tr. 1030.) [22] Mr. Pinto then facilitated and arranged the *ex parte* onboard interviews. (Tr. 884, 1029.) Mr. Corteselli testified credibly that his agreement to contribute to the cost of discharge was not conditioned on obtaining Mr. Pinto's assistance. (Tr. 1127–28.) Mr. Corteselli was

a credible witness, and the Court accepts this testimony. The discharge of the SATURN II's cargo was completed in early January 2003. (Tr. 561, 1043.)

### B. *The Salvage Association's Final Findings*

On January 14, 2003, pursuant to Mr. Corteselli's instructions, Mr. Johnstone returned to the SATURN II to take additional freeboard measurements and to perform a follow-up survey to determine the extent of the damage. (Tr. 561, 1043.) He was accompanied by Messrs. Petsinis and Petrakakos. (Tr. 561.) Mr. Johnstone testified that there was no evidence of damage to the SATURN II's cargo holds, no twisting of the vessel plates, no water in either of the duct keels,[23] and no evidence that the vessel was breaking up. (Tr. 562–66; Ex. 91.) These findings contradicted the information given to Mr. Johnstone by Mr. Petrakakos. (Tr. 562.) When Mr. Johnstone took freeboard measurements this time, there was no indication of any deflection (or twisting) of the hull. (Tr. 573.) This was not the case during Mr. Johnstone's October 2002 visit, where he did detect some twisting. The explanation for the new readings is twofold: (1) the October 2002 measurements were not reliable, as the Court has noted, and (2) the cargo had been discharged. After discharge, the twisting righted itself. (Tr. 573.) As of January 2003, Mr. Johnstone saw no evidence to support any claim that the SATURN II was a CTL.

Mr. Johnstone reported his findings to Mr. Corteselli in Addendum No. 2, dated January 18, 2003:

---

**22.** In January 2003, after the cargo was discharged, Mr. Corteselli agreed to contribute an additional $20,000 for a total of $400,000. (Tr. 1058.)

**23.** The duct keel is an empty space at the bottom of the ship that follows the center line. The bottom of the duct keel is the outside skin of the ship. (Tr. 564.)

[T]here is, in our opinion no evidence to support the owners [sic] previous claim that the vessel is twisted or misaligned.

. . . .

... In our opinion the vessel hull is not misaligned nor has excessive hog or sag for her current condition.

(Ex. 91 at P 2868, 2869.) Mr. Johnstone's opinion of the total costs to repair the SATURN II, including the costs to make temporary repairs and to tow the vessel to a repair yard in Dubai, remained unchanged at $2.7 million. (Tr. 575–78, 1048; Ex. 91–92.) The Court observed Mr. Johnstone testify at trial over two days and finds his testimony credible.

As of late December 2002, Mr. Corteselli had not received many of the documents he had requested in his August 19, 2002 reservation of rights letter. (Tr. 970–71, 1018–20, 1036–39.) For example, Mr. Corteselli received no documentation concerning the sale of the SILVER TOY. (Tr. 1036.) MSM and Endeavour also failed to provide Mr. Corteselli with any documents itemizing or supporting claims for salvage, general average or sue and labor expenses despite Nikos Christodoulatos's claim that MSM had a statement of general average prepared. (Tr. 1060–61, 1402–05.)

C. *Plaintiffs' Final Coverage Decision*

The post-grounding investigation was completed just over seven months after the grounding. On January 27, 2003, AI Marine notified the defendants on behalf of all insurers that, *inter alia*, there was no coverage for the claimed CTL of the SATURN II and that the H & M contracts were void *ab initio* as a result of the defendants' breaches of the duty of utmost good faith during placement of the risk and presentation and maintenance of the claim. (S.F. # 49.) The next day, plaintiffs filed the instant lawsuit. (S.F. # 50.) American Home and New York Marine hold $11,885.66 and $4,425.03, respectively,

in premium for the policy year June 22, 2002 through June 22, 2003. (Ex. 16, 17.) As of May 2003, these insurers had tendered the return of these amounts, but the owners did not accept the tender. (*Id.*) None of the other plaintiff insurers received any premium for that policy year. (Tr. 76, 103, 113, 141, 271.)

The SATURN II remained under the jurisdiction of the Indian court until it was sold at a judicial sale in India in July 2003 for $2.1 million. (S.F. ## 47–48.) The vessel was taken to a scrap yard in Alang, India. Cutting began in October 2003. (S.F. # 51.)

VII. **SOME FINDINGS AS TO CREDIBILITY**

The Court observed fifteen days of witness testimony. Credibility determinations are sprinkled throughout the foregoing findings of fact. By way of summary, it suffices to say all of the witnesses who testified during plaintiffs' case-in-chief were completely credible. The Court finds the deposition testimony of Captain Padayhag also completely credible. The deposition testimony of Chief Engineer Santos was less so.

On the defendants' side, things took a 180–degree turn. With the exception of the eminently professional Captain Bergin, all of the witnesses who testified during defendants' case-in-chief were not worthy of belief. In the Southern District of New York a Bible is not needed to swear a witness before testimony. If a Bible were used in this case it is likely that the Good Book would have danced the Charleston all around the courtroom. The Court makes this cynical observation because of the cavalier fashion in which Messrs. Nikos Christodoulatos, Petsinis and Moundreas treated the truth. It was amazing to behold. They all lied and did so frequently.

At one point, the Court even warned defense counsel that Mr. Moundreas was risking contempt because of his desultory refusal to answer the questions put to him on cross examination. (Tr. 1894–95.)

## CONCLUSIONS OF LAW

### I. LEGAL PRINCIPLES

#### A. *Jurisdiction and Declaratory Judgment*

■ This action falls within the Court's admiralty and maritime jurisdiction, which extends to cases involving marine insurance contracts. 28 U.S.C. § 1333; *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 121 (2d Cir.2001). The Court has discretion to exercise jurisdiction in declaratory judgment actions. *See* 28 U.S.C. § 2201(a). Before entertaining a declaratory judgment action, the Court must consider (1) whether the judgment would clarify or settle the legal issues involved and (2) whether the judgment would bring finality to the controversy and offer relief from uncertainty. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir.2005). Both considerations are satisfied here.

#### B. *Choice of Law*

■ In the marine insurance context, federal law applies where there is an established federal admiralty rule governing the issue, and in the absence of such a rule, state law will be applied. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 314–16, 75 S.Ct. 368, 370–71, 99 L.Ed. 337, 343–44 (1955). As demonstrated in the subsections that follow, most of the issues in this case are subject to established Supreme Court and circuit precedent. Federal admiralty rules therefore govern unless otherwise stated.

## II. MISREPRESENTATIONS AT THE PLACEMENT STAGE

■ Marine insurance is a contract *uberrimae fidei*, meaning that the parties owe each other a duty of utmost good faith. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir.1986). As part of this obligation, the assured "is required to disclose all circumstances known to him which materially affect the risk." *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir.1985). Lord Mansfield made a famous statement of the duty in *Carter v. Boehm*, (1766) 97 Eng. Rep. 1162, 3 Burr.1905 (K.B.). In 1828 the Supreme Court, speaking through Justice Story, imported the duty into American marine insurance law:

> The contract of insurance has been said to be a contract uberrimae fidei, and the principles which govern it, are those of an enlightened moral policy. The underwriter must be presumed to act upon the belief, that the party procuring insurance, is not, at the time, in possession of any facts, material to the risk which he does not disclose .... And even if there be no intentional fraud, still the underwriter has a right to a disclosure of all material facts, which it was in the power of the party to communicate by ordinary means; and the omission is fatal to the insurance.

*M'Lanahan v. Universal Ins. Co.*, 26 U.S. (1 Pet.) 170, 185, 7 L.Ed. 98, 105 (1828). The Supreme Court re-visited the duty of utmost good faith in a subsequent case:

> It is the duty of the assured to place the underwriter in the same situation as himself; to give to him the same means and opportunity of judging of the value of the risks; and when any circumstance is withheld, however slight and immaterial it may have seemed to himself, that, if disclosed, would probably have influ-

enced the terms of the insurance, the concealment vitiates the policy.

*Sun Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485, 510–11, 1 S.Ct. 582, 600, 27 L.Ed. 337, 346 (1882) (quoting with approval William A. Duer, *A Course of Lectures on the Constitutional Jurisprudence of the United States* (Lect.13, Pt. 1, Sec.13)). The duty of utmost good faith is an established federal admiralty rule. *See Puritan Ins. Co.*, 779 F.2d at 870.

## A. *Fleet Size*

Plaintiffs in their first cause of action allege that defendants violated the duty of utmost good faith by representing that the MSM account was a multiple-vessel fleet and not a singleton. Plaintiffs argue that the violation renders the policy voidable *ab initio*. Defendants argue that the misrepresentation as to fleet size, even if one was made, should not void the policy.

### 1. Defendants Made Material Misrepresentations

The first question for the Court is whether the defendants made a misstatement at all. The evidence establishes that the answer is in the affirmative. Even defendants' counsel conceded in oral argument that a "negligent" misstatement occurred with respect to MSM's fleet size. (O/A Tr. 4.)[24] The Court next considers whether the misstatement was "material." A fact is material if it is something "likely to influence [the underwriter's] judgment in accepting the risk." *Sun Mut. Ins. Co.*, 107 U.S. at 509, 1 S.Ct. at 599, 27 L.Ed. at 345; *Puritan Ins. Co.*, 779 F.2d at 871 ("A fact is not material unless it is 'something which would have controlled the underwriter's decision.'"). An objective standard of disclosure applies, "that is, whether a reasonable person in the assured's position would know that the particular fact is material." *Knight*, 804 F.2d at 13. The credible testimony of Messrs. Keefe, O'Doherty, McAndrew, Lund, Azou, Cobus and Dalianis established without question that the underwriters, if they knew that the SATURN II account was a singleton, either (1) would not have insured the account at all, or (2) would have charged higher premiums, demanded different terms and conditions or insured a smaller percentage of the overall risk. The belief that the MSM account was a multiple-vessel fleet controlled the insurers' decisions of whether to insure the SATURN II and on what terms.

The Court gives particular weight to the testimony of Harry S. Keefe, Plaintiffs' eminently qualified expert witness on H & M insurance. Mr. Keefe cogently and credibly explained the recuperative theory of the insurance business and how important it is for the insurer to know how many vessels he is insuring. The recuperative theory cannot work if the assured keeps this information secret from the insurer. Mr. Keefe confirmed the testimony of all of the underwriters' agents that fleet size determines whether the insurer will accept the risk and on what terms. Defendants were unable to impeach this testimony. In fact, Mr. Piazza, the owners' broker, corroborated it. The Court concludes that it was material that the MSM account was a singleton and not a three-vessel fleet, and a reasonable person in defendants' position would have known it to be material.

The Court is aware that the duty of the insured to disclose material facts to the insurer is not unlimited. "[A] minute disclosure of every material circumstance is not required. The assured complies with the rule if he discloses sufficient to call the

attention of the underwriter [to the matter] in such a way that, if the latter desires further information, he can ask for it." *Puritan Ins. Co.*, 779 F.2d at 871 (quoting 2 Michael J. Mustill & Jonathan C.B. Gilman, *Arnould's Law of Marine Insurance and Average* § 646, at 493 (16th ed.1981)). The owners did not comply with the rule. Through HBI, the owners unequivocally represented that the SILVER TOY was part of the fleet. The sale of the SILVER TOY occurred in May 2002, during the placement of the policies and well before the June 22, 2002 inception date.

■ The owners knew about the sale despite Nikos Christodoulatos's protestations to the contrary. Mr. Christodoulatos testified that MSM informed HBI of the sale on June 13, 2002. (Tr. 1371–74.) There is a facsimile to this effect in evidence. (Ex. K–4.) The Court chooses to accept Mr. Piazza's more credible testimony that HBI was first notified of the sale by the mortgagees in early August 2002. (Tr. 358, 362–65.) Defendants had the opportunity to examine Mr. Piazza on this very point but failed to do so. (Tr. 371.) In any event, the broker acts on behalf of the insured, not the insurance company. *Howard Fuel v. Lloyd's Underwriters*, 588 F.Supp. 1103, 1108 (S.D.N.Y.1984) (Sprizzo, J.). Even if MSM gave notice to HBI, the evidence showed that the notice did not make its way to the insurers. HBI never acted on the behalf of the insurers. Notice to HBI was not notice to the insurers.

The DOO YANG HOPE is a closer call than the SILVER TOY. There was testimony at trial from Nikos Christodoulatos and (more credibly) Mr. Piazza that no one guaranteed to the insurers that the DOO YANG HOPE would attach to the policies. On the other hand, the proposals that HBI and its co-brokers sent to AIMA, New York Marine, Bluewater and Ethniki listed the DOO YANG HOPE as "TBR" ("to be renamed"). It would be counterintuitive to believe that the owners were going to rename a vessel that they did not own. As the Court discussed *supra* in Part II.B of the Findings of Fact, in the cover sheet of the provisional binder sent to Mr. O'Doherty of AIMA, Mr. Piazza stated that the DOO YANG HOPE would "in all likelihood [sic] attach prior to the renewal date [June 22, 2002]." The Bluewater proposal also was misleading: "The fleet currently comprises two bulk carriers but we understand that a new acquisition—'DOO YANG HOPE'—will be added to the slip shortly." Mr. Watson of LSN had informed Generali France that the vessel had been "recently purchased." In the Court's view, the representations of the DOO YANG HOPE on the placement documents were not entirely truthful and inconsistent with defendants' duty of utmost good faith.

### 2. Plaintiffs Relied on the Misrepresentations

■ The Court now considers whether the plaintiffs relied on defendants' material misstatements as to fleet size. "[A] marine insurance policy 'cannot be voided for misrepresentation where the alleged misrepresentation was not relied upon and did not in any way mislead the insurer.'" *Puritan Ins. Co.*, 779 F.2d at 871 (quoting *Rose and Lucy, Inc. v. Resolute Ins. Co.*, 249 F.Supp. 991, 992 (D.Mass.1965)). As should be obvious by this point, the evidence at trial was compelling that the plaintiff underwriters relied on the owners' representations concerning the MSM fleet size when making their coverage decisions.

Defendants make much of the fact that there is no outright prohibition in the marine insurance industry against the insuring of singletons. (O/A Tr. 11; Def. Prop. Findings of Fact at 6–7.) This fact is of little moment. The issue is whether fleet

size is a material fact in the insurance context and, if so, whether the assured must disclose to the underwriter that the risk is a singleton. The evidence at trial established that this fact would be critical to the underwriting process. The insurers rely on the prospective assureds to be truthful on this point. In the Court's view, the information becomes even more important where, as here, there is *not* an outright prohibition against underwriting singletons.

There also was evidence that the underwriters did not have specific internal guidelines prohibiting the insuring of singletons. The word "guideline" is an important one for a federal judge. The sentencing guidelines would be worthless if the judge were not in possession of the facts of the case. The insurers' guidelines on singletons would be just as worthless if the insurer did not know whether he was insuring a singleton or a multiple-vessel fleet. It does not matter that these guidelines, if they existed, were internal, as Messrs. Azou, Lund and O'Doherty testified. (Tr. 105, 150, 226.) If the defendants had known about the guidelines, they would have known only that the insurers sometimes underwrite singletons. This knowledge would not alter their duty to disclose to the insurers that a singleton would be the risk in this particular case.

### 3. Remedy

On the basis of the foregoing evidence, the Court concludes that the defendants made material misrepresentations concerning the size of the MSM fleet and that the insurers reasonably relied on those misrepresentations in making coverage decisions on the MSM account. The Court

finds that these misrepresentations were intentional. They were consistent with the pattern of deception that marked defendants' conduct at all times relevant to this case. The defense's suggestion at oral argument that the misrepresentations were negligent is rejected. In any event, this finding is not outcome determinative. "The duty of communication [of material facts], indeed, is independent of the intention, and is violated by the fact of concealment even where there is no design to deceive." *Sun Mut. Ins. Co.,* 107 U.S. at 510, 1 S.Ct. at 599, 27 L.Ed. at 345.

■■■ The Court now considers whether the misstatements give the insurers the option of voiding the policies *ab initio.* Both *M'Lanahan* ("the omission is fatal to the insurance") and *Sun Mutual* ("the concealment vitiates the policy") come to the conclusion that a violation of the duty of utmost good faith renders the policy voidable. As the late Judge Pollack of this Court stated over twenty-five years ago: "The doctrine of Uberrimae fidei obligates the assured to volunteer information which might have a bearing on the scope of the risk assumed, and the failure to do so will allow the insurer to avoid the policy." *Contractors Realty Co. v. Ins. Co. of N. Am.,* 469 F.Supp. 1287, 1294 (S.D.N.Y. 1979).

Defendants attempt to stave off the inevitable result with three arguments. First, they contend that fleet size is not the type of misrepresentation justifying the sanction of voiding an H & M policy *ab initio* after the loss already occurred. In support of this proposition, defendants cite without discussion one District of Rhode Island case, one case from this district, and two cases from this circuit.[25] These

---

25. The four cases are *Albany Ins. Co. v. Wisniewski,* 579 F.Supp. 1004 (D.R.I.1984), *Thebes Shipping, Inc. v. Assicurazioni Ausonia S.P.A.,* 599 F.Supp. 405 (S.D.N.Y.1984), *King*

*v. Aetna Ins. Co.,* 54 F.2d 253 (2d Cir.1931) (incorrectly cited by defendants) and *Puritan Ins. Co.,* cited *supra.*

cases have nothing to do with fleet size. In fact, neither side has cited a case addressing whether a misrepresentation of fleet size constitutes a violation of the duty of utmost good faith. Second, defendants argue that no term of the policy justifies cancellation *ab initio* because of a misrepresentation as to fleet size. True enough, but irrelevant. A violation of the duty of utmost good faith during the placement of an insurance contract, under the law of this circuit, renders the insurance contract voidable by the aggrieved party. Third, defendants claim that the "each vessel deemed separately insured" language renders the policies ambiguous on the issue of fleet size. Ambiguity, they argue, should be construed in favor of coverage. This argument is not convincing. But for defendants' misrepresentations, there would be no "separately insured" vessels, or any policy for that matter, in the first place. Mr. Keefe's explanation of the recuperative theory of the insurance business more than answers this argument. Even if the vessels were separately insured, the insurers agreed to the insurance because they believed that they were spreading their risk across a three-vessel fleet.

The Court concludes that the proper remedy for the defendants' breach of the duty of utmost good faith is a declaratory judgment that the policy is voidable *ab initio* at the plaintiffs' instance. Plaintiffs therefore are entitled to declaratory judgment on their first cause of action.

### B. *Unseaworthiness*

■ In their second cause of action, plaintiffs allege that defendants violated the duty of utmost good faith at the placement stage by concealing that the SATURN II was unseaworthy. The complaint refers to the vessel's mechanical problems; e.g., the cracked cylinder and defective

fresh water evaporator. The Court finds that the evidence is not sufficient to sustain this cause of action. The evidence bears out that the SATURN II had mechanical problems during the placement stage. The cracked cylinder is the most obvious example. It is not clear, however, that the underwriters relied on the owners' omissions concerning unseaworthiness in the way that they relied on the fleet-size misstatements. The evidence does not demonstrate to the Court's satisfaction that the underwriters premised their coverage decisions on a mistaken belief that the SATURN II was in fine working order. Accordingly, the Court declines to award plaintiffs a judgment on their second cause of action.[26]

## III. MISREPRESENTATIONS AT THE CLAIMS STAGE

In their third cause of action, plaintiffs allege that defendants breached the duty of utmost good faith with respect to their claim. Plaintiffs contend that the policy should be voided *ab initio* because defendants altered and destroyed documents relevant to the post-grounding investigation. Plaintiffs assume, however, that the assured is bound by the duty of utmost good faith at the claims stage, and that the proper remedy for a violation of the duty is the same as at the placement stage. In support of their argument, plaintiffs cite without serious analysis a case from the House of Lords, *Manifest Shipping Co. v. Uni–Polaris Ins. Co. (The Star Sea)*, [2001] UKHL 1, [2003] 1 A.C. 469, and an unreported case from a Connecticut state court, *Rocco v. Continental Ins. Co.*, No. CV990171669SX05, 2003 WL 21235478 (Conn.Super.Ct. May 13, 2003). Neither case helps plaintiffs' cause.

---

**26.** The Court notes that in their post-trial brief, plaintiffs did not propose a conclusion of law that corresponded to this cause of action.

In the *Star Sea* case, the Lords seemed willing to accept the parties' agreement that the duty of utmost good faith applies beyond the placement stage. Nevertheless, Lord Hobhouse treaded carefully on the issue of voiding the policy *ab initio* for a breach of the duty at the claims stage:

> [The right to avoid the contract retrospectively] is appropriate where the cause, the want of good faith, has preceded and been material to the making of the contract. But, where the want of good faith first occurs later, it becomes anomalous and disproportionate that it should be so categorised and entitle the aggrieved party to such an outcome.... The result is effectively penal.

*Manifest Shipping*, [2003] 1 A.C. 469, ¶ 51. One would expect the terms of the policy to govern the insured's conduct at the claims stage. If such terms are not in the contract, the Court hesitates to impose on the insured the duty of utmost good faith and its disclosure requirements. Even if the duty did apply, a misrepresentation at the claims stage does not call the formation of the contract into question. Voiding the policy *ab initio* at the claims stage indeed would be penal, as Lord Hobhouse recognized. *Rocco* does not aid plaintiffs either. There, the court voided the policy *ab initio* because of misstatements at the placement stage. *Rocco*, 2003 WL 21235478 at *8. The court also held that misrepresentations at the claims stage voided coverage under the policy terms. *Id.* Plaintiffs do not bring similar policy terms to the Court's attention in the instant case.

 Having held the policy voidable *ab initio* on another ground, the Court declines to afford plaintiffs the same relief with respect to the defendants' maintenance of their claims. Even if the duty of utmost good faith applied to claims, the plaintiffs did not strictly adhere to it either. They did not disclose to defendants anything about the onboard *ex parte* crew interviews. The policies are not voidable *ab initio* because of defendants' misrepresentations with respect to their claim. The Court therefore declines to award plaintiffs the judgment on their third cause of action.

## IV. WHETHER DEFENDANTS CAN SHOW A VALID CLAIM

 In their fourth cause of action, plaintiffs contend that they should not be liable on the claims because the defendants cannot show how the loss occurred, nor can they show a valid claim. The policy here is a named perils policy. *See Miller Marine Svcs., Inc. v. Travelers Prop. Cas. Ins. Co.*, No. 04 Civ. 5679(ILG), 2005 WL 2334385, at *4–*5 (E.D.N.Y.2005) (explaining the self-evident difference between a "named perils" and an "all risk" policy). Defendants have the burden of proving that the loss arose from a covered peril. *See Nw. Mut. Life Ins. Co. v. Linard*, 498 F.2d 556, 561 (2d Cir.1974). One of the named perils in the policy is a peril "of the Seas." (Ex. 5 at 1–226.) Plaintiffs established at trial, however, that the accident occurred because (1) the vessel was overloaded, (2) the No. 6 cylinder was cracked, and (3) the owners ordered the vessel into the Grant Channel despite these two conditions. The liner negligence clause would provide coverage despite the owners' actions, unless the owners' negligence arose from want of diligence. The Court finds that the owners were not diligent. The owners knew that the vessel was overloaded and that it was leaking fresh water. They sent it into the Grant Channel area anyway. Once the vessel grounded, the owners ordered the captain to lie about fresh water and draft.

In addition, defendants sabotaged the post-grounding investigation by sending

Mr. Petsinis to destroy or alter relevant ship documents and computer equipment. Given the confused and unreliable state of any documentation pertaining to the grounding, defendants cannot meet the burden of showing a valid claim against the policy. The Court therefore awards plaintiffs a declaratory judgment on their fourth cause of action. Even if the policies were not voidable *ab initio*, plaintiffs would be able to deny coverage because defendants cannot show a valid claim.

## V. THE IMPLIED WARRANTY OF SEAWORTHINESS

The Court next assesses plaintiffs' fifth cause of action. Plaintiffs allege that they may deny coverage on the ground that defendants breached the implied warranty of seaworthiness because of the over-loading of the SATURN II and the defective cylinder. Defendants argue that the implied warranty does not apply because the SATURN II was at sea on the inception date of the policy. (Def. Prop. Conc. of Law at 51–53.) The Court agrees with defendants.

The Supreme Court has recognized the existence of the implied warranty of seaworthiness in maritime contracts:

> In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not

depend on his knowledge or ignorance, his care or negligence.

*The Caledonia*, 157 U.S. 124, 130, 15 S.Ct. 537, 540, 39 L.Ed. 644, 646 (1895). There is some dispute as to whether the implied warranty applies in this circuit to time policies. In one case, the Circuit noted that "[t]here is in the United States an implied warranty by the insured in a time marine policy that the ship is seaworthy at the time the policy period begins. But that is true only when the vessel is in port at the time." *Henjes v. Aetna Ins. Co.*, 132 F.2d 715, 719 (2d Cir.1943) (citation omitted). In a later case, the Circuit suggested that the implied warranty does not apply to time policies. *N.Y., New Haven and Hartford R.R. Co. v. Gray*, 240 F.2d 460, 466 (2d Cir.1957). In *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp. 1046, 1065–67 (S.D.N.Y.1997) (Cote, J.), *aff'd on other grounds*, 134 F.3d 103 (2d Cir.1998), the district court took the position that the implied warranty would apply to time policies. Plaintiffs cite this case and the Fifth Circuit's decision in *Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385 (5th Cir.1957), in support of their argument.

■ The Court need not reach the issue here. Even under *Henjes*, the implied warranty of seaworthiness is not applicable if the vessel is at sea when the policy commences. In the instant case, the SATURN II was between Singapore and Dahej on the June 22, 2002 inception date. Defendants therefore did not violate the implied warranty of seaworthiness.[27] Plaintiffs are not entitled to judgment on their fifth cause of action.

---

**27.** There is some authority suggesting that the liner negligence clause in the policy effected at least a partial waiver of the implied warranty of seaworthiness. *Employers Ins. of*

*Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1434–35 (5th Cir.1992). *See generally* 8 *Benedict on Admiralty* § 12.08, at 12–18 to 12–19 (7th ed. rev.2005).

## VI. DEFENDANTS' COUNTERCLAIMS

### A. *First Counterclaim: Constructive Total Loss*

 Defendants allege in their first counterclaim that plaintiffs are liable under the policy because the SATURN II was a constructive total loss ("CTL"). Even if the policy were not already voidable, the evidence at trial does not support the defendants' contention. The policy provides that "[t]here shall be no recovery for a constructive Total Loss hereunder unless the expense of recovering and repairing the Vessel would exceed the Agreed Value." (Ex. 5 at 1–228.) The agreed-upon value of the SATURN II was $7,500,000. The evidence at trial demonstrated that the cost of repairs and recovery was far below that figure. Mr. Johnstone of the Salvage Association estimated that the cost would be $2.7 million when the cargo was still aboard the ship. At that time there was some evidence of twisting, but the cargo was largely responsible, not the grounding. After discharge of the cargo, Mr. Johnstone wrote in his Addendum No. 2, dated January 18, 2003, that there was "no evidence" to support the owners' claim that the SATURN II was twisted. Even Gerassimos Christodoulatos testified at deposition that he believed the opinion of the Salvage Association (Mr. Johnstone's employer) to be "definitive" on the CTL issue. (G. Christodoulatos Dep. 137–38.) The Court accepts Mr. Johnstone's testimony that the amount of damage to the SATURN II was $2.7 million. Accordingly, the Court finds that the SATURN II was not a CTL under the policy. Defendants' first counterclaim is denied.

### B. *Other Counterclaims*

Defendants' second counterclaim seeks general average and sue and labor expenses under the policy. In light of the Court's finding that the policy is voidable *ab initio*, this counterclaim is denied. Defendants in their third counterclaim allege that plaintiffs violated the policy and their fiduciary duties as a result of their handling of the claim. On page 59 of their proposed conclusions of law, defendants request an award of punitive damages on this ground. This is some chutzpah, given defendants' own handling of their claim. The third counterclaim is denied. The fourth counterclaim (incorrectly labeled an "affirmative defense") accuses plaintiffs of damaging the SATURN II with respect to discharge of the cargo. While it is true that the SATURN II was sold at a judicial sale for $2.1 million, which was $5.4 million less than its agreed value, there is not a preponderance of evidence that plaintiffs' actions with respect to the cargo damaged the vessel. The fourth counterclaim is denied.

## VII. ESTOPPEL

Defendants contend that plaintiffs should be estopped from denying coverage on two grounds. First, defendants contend that plaintiffs repeatedly breached the duty of utmost good faith during the policy period. Other than the *ex parte* interviews, the Court is not aware of any questionable behavior on plaintiffs' part. Even if defendants' allegations are true, they do not change the Court's determination that the policy is voidable *ab initio* because of misrepresentations at the placement stage. The second ground is that plaintiffs unjustifiably delayed in formally rescinding the policy. Defendants contend that the underwriters had discussed the singleton problem as early as July and August 2002, yet they waited until January 2003 to decline coverage. The Court rejects this contention.

■ Defendants cite a Second Circuit case in support of their estoppel argument. This case applied New York law. *See U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 369 F.3d 102, 106–07 (2d Cir.2004). For the purposes of *Wilburn Boat*, cited *supra* in Part I.B, the Court will assume along with the defendants that New York law applies. An insurer's disclaimer of coverage "will be given effect unless the [insured] can show prejudice as a result of unreasonable delay in disclaiming." *Inc. Vill. of Pleasantville v. Calvert Ins. Co.*, 204 A.D.2d 689, 690, 612 N.Y.S.2d 441, 443 (2d Dep't 1994). Here, the delay of seven months, if a delay at all, was not unreasonable. Perhaps plaintiffs might have made their coverage decision more quickly if defendants' agents had not destroyed and altered documents and other information relevant to the grounding. Defendants also fail to show prejudice from the alleged delay. Plaintiffs are not estopped from voiding the policy or denying coverage.

## VIII. ATTORNEYS' FEES AND COSTS

■ Both sides seek an award of attorneys' fees and expenses. Plaintiffs contend that defendants acted in bad faith and that defendants' agents gave false testimony during the trial. Defendants argue that plaintiffs handled the claim investigation of the claim in bad faith. Federal admiralty law governs the issue of attorneys' fees and costs in maritime insurance actions. *Am. Nat'l Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 270 (2d Cir.1995). In this circuit, "the general rule is that the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith." *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 309 (2d Cir.1987). It should be

clear by now that defendants are not entitled to fees or expenses. The Court also declines to award fees and expenses to plaintiffs because of the *ex parte* interviews. While defendants were more culpable with respect to bad faith, they were not entirely alone. An award of attorneys' fees or litigation expenses is not appropriate in this case. However, having prevailed in this lawsuit, plaintiffs are entitled to recover the costs specified in 28 U.S.C. § 1920. See Fed. R. Civ. P. 54(d)(1).

## IX. RETURN OF PREMIUM TO DEFENDANTS

The Court having declared that plaintiffs may void the policy *ab initio*, the final issue is whether defendants have a right to the return of their premiums. Defendants paid $11,885.66 to American Home and $4,425.03 to New York Marine. The evidence at trial showed that no other insurer received a payment of premium.[28] Neither party briefed this issue in its post-trial submission.

■ While the general rule is that the insured has no right to seek the return of premium when he fraudulently induces the insurer to assume a risk, 5 *Couch on Ins.* § 79:40 (3d ed.2005), the nub of the issue is how best to return the parties to their pre-policy positions. Finding no controlling cases from either the Second Circuit or New York, the Court is persuaded by the reasoning of the First Circuit in *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370 (1st Cir.1991) (Rhode Island law) and the Washington Supreme Court in *Glandon v. Searle*, 68 Wash.2d 199, 412 P.2d 116 (1966). Both cases recognize that the repayment of premium is a condition precedent to rescinding an insurance policy on the basis of a misrepresentation. *Borden*, 935 F.2d at 379; *Glandon*, 68 Wash.2d at

**28.** *See supra*, Findings of Fact, Part VI.C.

204, 412 P.2d at 119; *see also* 5 *Couch on Ins.* § 79:40 ("[A]n insurance company seeking rescission for fraud must tender the premiums and pay them into court, and is not entitled to have them refunded to it when the policy is ordered cancelled."). In *Borden,* Judge Selya aptly noted that if the insurer pays a claim on a subsequently rescinded policy in excess of the premium, the insurer may offset its loss against the premium. *Borden,* 935 F.2d at 379. The plaintiff insurers in the instant case did not pay on the defendants' claim and have no need of offset to be restored to the pre-policy status quo.

The Court therefore will order that the premiums paid by defendants to American Home and New York Marine must be tendered to defendants upon cancellation of the policy.

### CONCLUSION

The Court grants plaintiffs declaratory judgment on the first and fourth causes of action in their complaint. The H & M policy is voidable *ab initio* at plaintiffs' instance because of defendants' intentional misrepresentation concerning the size of their fleet during placement of the policy. Even if the policy were still in force, plaintiffs could deny coverage because defendants cannot show a valid claim under the policies. Upon voiding the policy *ab initio,* plaintiffs American Home and New York Marine shall return to defendants, respectively, $11,885.66 and $4,425.03 in premiums. Defendants are denied judgment on their counterclaims. The applications for attorneys' fees and costs are denied. This constitutes the judgment of the Court. The case is closed.

**SO ORDERED.**